**COMMONWEALTH of Pennsylvania,**
**Appellee**

v.

**Allen WILEY, Appellant.**

Superior Court of Pennsylvania.

Argued July 27, 2004.

Filed Aug. 23, 2004.

Reargument Denied Oct. 27, 2004.

Lori Mach, Philadelphia, for appellant.

Grandy Gesvino, Asst. Dist. Atty., Philadelphia, for Com., appellee.

Before: LALLY–GREEN, GANTMAN, and TAMILIA, JJ.

LALLY–GREEN, J.:

¶ 1 Appellant, Allen Wiley, appeals from the judgment of sentence entered on October 1, 2003, following his conviction for two violations of the Uniform Firearms Act: 18 Pa.C.S.A. § 6106[1] and 18 Pa.C.S.A. § 6108.[2] We vacate the judgment of sentence and remand.

¶ 2 The trial court stated the facts as follows:

On March 11, 2003, at approximately 12:00 p.m., civilian Lawrence Thompson observed defendant inside Daniel's Restaurant, located around 900 Godfrey Avenue in Philadelphia, with the butt of a gun protruding from his waistband. Mr. Thompson followed defendant as he left the restaurant and located him thirty yards away sitting in a barber shop. Mr. Thompson immediately called 911 on his cell phone to inform the police that he observed defendant-a black male, about five feet, seven inches, and around twenty-five years old—carrying a firearm; he also informed the operator that defendant came out of Daniel's Restaurant and walked into a barber shop on Godfrey Avenue, giving the dispatcher the location of the shop. Mr. Thompson then parked his car across the street from the barber shop, and watched the front door of that location until police arrived. After defendant was arrested, and it was safe for Mr. Thompson to approach, he informed the officer that it was he who called 911, and provided his

1. Firearms not to be carried without a license.

2. Carrying firearms on public streets or public property in Philadelphia.

identifying information to the officer (N.T. 7/28/03, p. 12–16).

Philadelphia Police Officer Edward Fidler, Badge # 4666, testified that he received the radio call that day for a person with a gun. The flash information described a black male with a light-complexion, inside the barber shop on Godfrey Avenue with a gun in his waistband. Officer Fidler was familiar with the area and the barber shop at 906 Godfrey Avenue. The Officer entered the shop with his gun drawn, for his safety. He then asked defendant to raise his hands and shook defendant's waistband, recovering a black .22 caliber revolver loaded with eight live rounds. Defendant was arrested and placed into custody. Around one and a half minutes had transpired from the time Officer Fidler received the radio call until the time he recovered the gun (N.T. 7/28/03 p. 18–20, 24).

On March 11, 2003, defendant was arrested and charged with violating 18 Pa.C.S. § 6106, of the Uniform Firearms Act, Firearms not to be carried without a license (third-degree felony), and 18 Pa.C.S. § 6108, Uniform Firearms Act, Carrying firearms on public streets or public property in Philadelphia (first-degree misdemeanor.) On July 28, 2003, defendant litigated a motion to suppress physical evidence, which was held under advisement. The motion was denied on September 10, 2003, and defendant thereafter proceeded to trial without a jury. After hearing the evidence, this court found defendant guilty on all charges. Defendant's sentencing was held on October 1, 2003, whereupon this court imposed a term of two to six months incarceration followed by a concurrent term of three years reporting probation for his conviction for carrying a firearm without a license.

On October 2, 2003, defendant filed a timely notice of appeal. On October 9, 2003, this court ordered defendant to file a Statement of Matters Complained of on Appeal, Pa. R.A.P.1925(b). Defendant replied to the order on October 23, 2003, claiming that the trial court erred in denying his motion to suppress.

Trial Court Opinion, 11/20/03, at 1–3.

¶ 3 Appellant raises one issue for our review:

> Did not the lower court err in denying appellant's motion to suppress physical evidence, where the police stopped and frisked appellant based on a vague, uncorroborated anonymous call and only later, after the seizure, did the police determine the name and address of the caller?

Appellant's Brief at 3.

¶ 4 "Our review of a suppression ruling is limited to determining whether the record as a whole supports the suppression court's factual findings and whether the legal conclusions drawn from such findings are free of error." *Commonwealth v. Battaglia*, 802 A.2d 652, 654 (Pa.Super.2002) (citation omitted). Our scope of review is limited: "we must consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole." *Commonwealth v. Maxon*, 798 A.2d 761, 765 (Pa.Super.2002). "Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts." *In the Interest of D.M.*, 560 Pa. 166, 743 A.2d 422, 424 (1999).

¶ 5 Our sole issue for review is the legality of the stop and frisk of Appellant under Article I, § 8 of the Pennsylvania Constitution, and the Fourth Amendment of the

United States Constitution. Both protect an individual from unreasonable searches and seizures. Our analysis begins with *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *Terry* sets the standard for the reasonableness of an investigative stop under the Fourth Amendment of the United States Constitution. *Terry* also sets forth the standard for the reasonableness of an investigative stop under Art. I, § 8 of the Pennsylvania Constitution. *Commonwealth v. Melendez*, 544 Pa. 323, 676 A.2d 226, 228–229 (1996).

■■ ¶ 6 Under *Terry* and *Melendez*, it is well established that a police officer may conduct a brief investigative stop of an individual, if the officer observes unusual conduct which leads him to reasonably conclude, in light of his experience, that criminal activity may be afoot. *Commonwealth v. Preacher*, 827 A.2d 1235, 1238 (Pa.Super.2003). "An investigatory stop subjects a person to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Such an investigatory stop is justified only if the detaining officer can point to specific and articulable facts which, in conjunction with rational inference derived from those facts, give rise to a reasonable suspicion of criminal activity and therefore warrant the intrusion." *Commonwealth v. E.M.*, 558 Pa. 16, 735 A.2d 654, 659 (1999) (citations omitted). In ascertaining the existence of reasonable suspicion, we must look to the totality of the circumstances to determine whether the officer had reasonable suspicion that criminal activity was afoot. *Commonwealth v. Riley*, 715 A.2d 1131, 1135 (Pa.Super.1998). If so, the officer would then be justified in conducting an investigative stop of the defendant.

■ ¶ 7 "Reasonable suspicion depends upon both the content of the information possessed by the police and its degree of reliability." *Commonwealth v. Kondash*, 808 A.2d 943, 946 (Pa.Super.2002). "To have reasonable suspicion, police officers need not personally observe the illegal or suspicious conduct, but may rely upon the information of third parties, including 'tips' from citizens. Naturally, if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable." *Commonwealth v. Swartz*, 787 A.2d 1021, 1024–25 (Pa.Super.2001) (*en banc*) (citations omitted).

¶ 8 In *Commonwealth v. Jackson*, 548 Pa. 484, 698 A.2d 571 (1997), our Supreme Court examined at length the so-called "man with a gun" scenario: namely, an anonymous tip that a person at a particular place matching a particular description is carrying a gun. Our Supreme Court held that such an anonymous tip, without independent police corroboration producing reasonable suspicion of criminal activity, is insufficient to justify a stop and frisk. The Court reasoned as follows:

> In [*Commonwealth v. Hawkins*, 547 Pa. 652, 692 A.2d 1068 (1997)], the Philadelphia police responded to an anonymous telephone report that there was a man with a gun at the corner of Sydenham and York Streets. The suspect was described as a black male wearing a blue cap, black jeans and a gold or brownish coat. We held that such allegations, without more, did not constitute reasonable grounds for the police to suspect that the individual was armed and dangerous:
>
> > If the police respond to an anonymous call that a particular person at a specified location is engaged in criminal activity, and upon arriving at the location see a person matching the description but nothing more, they have no certain knowledge except that the

caller accurately described someone at a particular location.... The fact that a suspect resembles the anonymous caller's description does not corroborate allegations of criminal conduct, for anyone can describe a person who is standing in a particular location at the time of the anonymous call. Something more is needed to corroborate the caller's allegations of criminal conduct.

*Hawkins,* 692 A.2d at 1070. Thus the details provided by the caller in this case were insufficient, even when corroborated, to satisfy the reasonable suspicion standard.

*Id.* at 574–575.

¶ 9 Our Supreme Court also explicitly **rejected** any "firearms exception" to the above rules. While the Court recognized the inherent danger of firearms on our streets, the Court still refused to allow for seizures based on the level of information set forth above. The Court reasoned as follows:

The Commonwealth contends, however, that the degree of danger to the police and the public from armed criminals is so great that if an anonymous caller provides a physical description of the individual, an accurate location and an allegation that the individual is armed, a *Terry* stop is justified. That argument will not withstand constitutional scrutiny. The danger to the police and public from firearms was already factored into the balance when the requirement of reasonable suspicion was articulated in *Terry.* To adopt the position that the Commonwealth urges is in reality to overrule *Terry* in favor of a lower standard of protection under the state and federal constitutions, a decision that we are not empowered to make.

*Hawkins* also involved an anonymous tip that the suspect was carrying a gun.

The distinction that we drew between what criminal activity was alleged, and the probability that the allegation was true, applies here. We found the search in that case to be unreasonable, stating that:

The fact that the subject of the call was alleged to be carrying a gun, of course, is merely another allegation, and it supplies no reliability where there was none before. And since there is no gun exception to the *Terry* requirement for reasonable suspicion of criminal activity, in the typical anonymous caller situation, the police will need an independent basis to establish the requisite reasonable suspicion.

*Hawkins,* 692 A.2d at 1070.

This case is factually indistinguishable from *Hawkins.* In *Hawkins,* we held that before the police may undertake a stop and frisk on the basis of an anonymous tip of a man with a gun, the police must establish that they have a reasonable suspicion that the individual is involved in, or about to commit a crime. If the tip contains sufficient information, the police can do this by corroborating sufficient details of the tip. Otherwise, the police must investigate further by means not constituting a search and seizure. If, as a result, they acquire sufficient information to give rise to a reasonable suspicion that the individual is armed and dangerous, they may then initiate a *Terry* stop. Neither condition was met in this case, and therefore the search was illegal.

*Id.* at 574–575 (footnotes omitted). Thus, even if this Court were sympathetic to recognizing a "firearms exception," we would be bound by our Supreme Court's unequivocal holding to the contrary. Indeed, the United States Supreme Court has come to the same conclusion on sub-

stantially similar facts as were present in *Hawkins. Florida v. J.L.*, 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000).

¶ 10 We now turn to the instant case. Appellant argues that the informant, Lawrence Thompson, was anonymous at the time of the search. Appellant also argues that the instant case is indistinguishable from *Jackson* and *J.L.* For the reasons that follow, we agree.

¶ 11 The record reflects that when Thompson called the police, he merely described a person, stated that person's location, and asserted that that person carried a gun. Thompson did not provide his name, address, or any other identifying information to police before hanging up the phone. The record does not reflect that the police had any means of identifying Thompson during the call, or after he hung up the phone. Thompson did not identify himself in person to the police before they executed their search. Thus, we conclude that from the time of Thompson's call through to the execution of the search and seizure, Thompson was completely anonymous. *See, Commonwealth v. Hayward,* 756 A.2d 23, 35 (Pa.Super.2000) (even a person who provides information in person to a police officer may be effectively anonymous if the person does not provide identifying information, does not accompany the officer to the scene, and is not otherwise known to the police); *compare, Commonwealth v. Lohr,* 715 A.2d 459, 462 (Pa.Super.1998) (caller's tip carried a higher degree of reliability where he gave his name to the dispatcher, indicated to the dispatcher that he was at the scene, and stayed on the phone while the officer proceeded to the scene).

¶ 12 The Commonwealth argues that Thompson's tip was more reliable than an anonymous call for three reasons. First, the Commonwealth asserts that Thompson was traceable and/or identifiable because he made his call with a cell phone. The record, however, refutes this assertion. The Commonwealth presented no evidence that the police traced Thompson's cell phone call, or that they identified Thompson's name or telephone number, or even that the Philadelphia Police had the capacity to take these actions. Based on the sparse evidentiary record in this case, we are constrained to conclude that the Commonwealth's position is based on speculation rather than evidence.[3]

¶ 13 Next, the Commonwealth argues that cell phone calls to the police are presumptively more reliable than ordinary cell phone calls, because the public believes that cell phone calls are traceable and/or identifiable. Thus, according to the Commonwealth, people are less likely to make false reports to police when they call on a cell phone. We need not dwell on this argument, other than to note that there is no evidence in the record to support it. As with the Commonwealth's first argument, we decline to base our legal rulings on such speculation.

¶ 14 Finally, and most importantly, the Commonwealth argues that Thompson was not anonymous because he identified himself to the police **after** the search was completed. Specifically, after the police arrested Appellant, Thompson emerged from his vantage point and confirmed that the police had arrested the right person.

---

**3.** In *J.L.*, Justice Kennedy wrote a concurring opinion adverting to the possibility that technological advances may give a greater reliability to anonymous calls in future cases. *J.L.*, 529 U.S. at 275–276, 120 S.Ct. 1375. Justice Kennedy concluded, however, that "these matters, of course, must await discussion in other cases, **where the issues are presented by the record.**" *Id.* at 276, 120 S.Ct. 1375 (emphasis added). This is not such a case.

The Commonwealth also argues that Thompson was reliable because he testified in person at the suppression hearing, and thus subjected himself to prosecution for making false reports to police.

¶ 15 We cannot agree. Assuming *arguendo* that Thompson increased his reliability by making himself known to police after the arrest, the Commonwealth may not benefit from this fortuitous event. The United States Supreme Court has squarely held that "[t]he reasonableness of official suspicion must be measured by what the officers knew **before they conducted their search.**" *J.L.*, 529 U.S. at 271, 120 S.Ct. 1375 (emphasis added). To hold otherwise would overturn the fundamental principle of search and seizure law that a search may not be justified by information gleaned for the first time after the search itself. For example, the factor which most powerfully shows the reliability of Thompson's tip was the fact that the police did indeed find a gun in Appellant's waistband. Yet the United States Su-

preme Court has rejected this reasoning: "[t]hat the allegation about the gun turned out to be correct does not suggest that the officers, **prior to the frisks,** had a reasonable basis for suspecting J.L. of engaging in unlawful conduct[.]" *Id.* (emphasis added).[4] For the reasons set forth above, we conclude that Thompson was, at all **relevant** times, anonymous.

¶ 16 The remainder of the facts of this case are indistinguishable from *Jackson* and *J.L.* Specifically, in each case, the officer corroborated the defendant's identifying features, but did not corroborate any activity giving rise to reasonable suspicion. As noted above, both our Supreme Court and the United States Supreme Court have held that this meager level of corroboration does not justify a stop and frisk. *Jackson; J.L.* We have no discretion but to follow the direction of these Courts. Accordingly, we conclude that the police lacked reasonable suspicion to stop and frisk Appellant, and that the weapon seized during the search should have been suppressed.[5]

---

4. The trial court found that Thompson was not anonymous because he appeared at court to testify. The court wrote:

> Any argument by defendant that it does not matter that the 911 caller later provided his name and address and appeared at the suppression hearing to testify regarding the incident is contrary to Pennsylvania case law, which permits a stop based on a radio bulletin as long as evidence is offered at the suppression hearing to establish reasonable suspicion; the mere fact that the police receive their information over police radio does not, in and of itself, establish or negate the existence of reasonable suspicion. Here, the Commonwealth satisfied its requirement of demonstrating that Officer Fidler had the requisite reasonable suspicion to stop and search [Appellant] where it brought the 911 caller to court to testify at the suppression hearing that he observed [Appellant] with a gun in his waistband.
>
> Trial Court Opinion, 11/20/2003, at 10–11, n. 9 (citations omitted).

To a limited extent, we agree with the trial court's statement of the law. For a stop to be valid, someone in the police department must possess sufficient information to give rise to reasonable suspicion. The officer with the reasonable suspicion, usually the dispatcher, need not convey all of this background information to the officer who actually effectuates the stop. *See, Commonwealth v. Korenkiewicz*, 743 A.2d 958, 964 (Pa.Super.1999) (*en banc*). Thus, the police may justify the search by presenting sufficient evidence at the suppression hearing that someone in the chain of command had reasonable suspicion before the stop, even if the arresting officer did not. *Id.*

This is not to say, however, that the Commonwealth may **generate** information giving rise to reasonable suspicion for the first time after the stop took place. In other words, even though the evidence of reasonable suspicion may be presented at a later suppression hearing, the police must have this evidence prior to the stop itself. *J.L.*

¶ 17 Judgment of sentence vacated. Remanded for further proceedings. Jurisdiction relinquished.

5. Before concluding, we will briefly address the Commonwealth's argument that the seizure was lawful pursuant to the "inevitable discovery" doctrine. "The inevitable discovery doctrine, or independent source rule, states that illegally seized evidence may be admissible, if the prosecution can demonstrate that the evidence in question was procured from an independent origin. Application of the 'independent source doctrine' is proper only in the very limited circumstances where the 'independent source' is truly independent from both the tainted evidence and the police or investigative team which engaged in the misconduct by which the tainted evidence was discovered." *Commonwealth v. Lehman*, 820 A.2d 766, 771 (Pa.Super.2003) (citations omitted).

The Commonwealth argues that "as soon as Officer Fidler had reemerged from the barbershop and placed defendant in his police car, Mr. Thompson went up to the officer and identified himself as the person who had made the 911 call. Thus, it is clear that had Officer Fidler not immediately run into the barbershop, or had reemerged from the barbershop without detaining and arresting defendant, Mr. Thompson would have approached him, identified himself, and personally provided him with the information that would have warranted the investigatory stop and protective frisk. This, of course, would have led to the discovery of the gun." Commonwealth's Brief at 10–11.

In our view, the Commonwealth has not identified an actual "independent source" so much as it has identified an hypothetical, alternate reality under which the seizure would have been lawful. This claim fails.