COMMONWEALTH of Pennsylvania, Appellant,

v.

Dale Stanley BARBER, Appellee.

Superior Court of Pennsylvania.

Argued Sept. 14, 2005.
Filed Dec. 8, 2005.

---

James P. Barker, Assistant District Attorney, Harrisburg, for Commonwealth, appellant.

Joseph D. Caraciolo, Camp Hill, for appellee.

Before: FORD ELLIOTT, STEVENS, JJ., and MCEWEN, PJE.

STEVENS, J.:

¶ 1 The Commonwealth appeals from the order entered in the Court of Common Pleas of Dauphin County granting Appellee's motion to suppress evidence seized from his van and person following the stop of his van.[1] The Commonwealth alleges the suppression court erred in concluding the police did not have reasonable suspicion to stop Appellee's van based on information provided to a 911 dispatcher by an identified caller. We reverse and remand for further proceedings consistent with this decision.

¶ 2 The record reveals the following: Appellee was arrested, and he filed a pretrial motion seeking to suppress evidence seized from his van and person. On June 15, 2004, the suppression court held a hearing during which the Commonwealth presented the testimony of Charles Stewart, Police Officer John McPhillips, Corporal Richard L. Smith, and Bruce Danner.[2] Specifically, Charles Stewart testified that on December 21, 2003 at 7:30 p.m., he and his children were exiting Media Play, which was a store in Paxton Township, when he noticed a van parked beside his vehicle. N.T. 6/15/04 at 5–6. As Mr. Stewart walked across the store's parking lot, he saw a man urinating between Mr. Stewart's vehicle and the van. N.T. 6/15/04 at 6. Mr. Stewart approached and asked the man, "What are you doing?" N.T. 6/15/04 at 6. The man zipped up his pants and got into the van. N.T. 6/15/04 at 7. Mr. Stewart and his children entered Mr. Stewart's vehicle, and as he was starting the vehicle, Mr. Stewart noticed the man drinking a beer in the van. N.T. 6/15/04 at 7. Mr. Stewart watched as the man backed the van out of the parking spot and parked in front of the store. N.T. 6/15/04 at 8. Mr. Stewart called 911 to report the man's actions. N.T. 6/15/04 at 8. Specifically, Mr. Stewart provided the 911 dispatcher with his name and phone number, his location, and described the events he had witnessed, including the urinating in public and drinking while driving. N.T. 6/15/04 at 8–11. Mr. Stewart also gave the 911 dispatcher a description of the van, the van's license plate number, and a description of the driver, who Mr. Stewart positively identified at the sup-

---

1. Pursuant to Pa.R.A.P. 311(d), the Commonwealth has certified in good faith that the lower court's order to suppress will terminate or substantially handicap the prosecution of this case.

2. No witnesses testified on behalf of Appellee during the suppression hearing.

pression hearing as being Appellee. N.T. 6/15/04 at 7, 11. Mr. Stewart remained in the store parking lot and Appellee remained in the van's driver's seat until the police arrived approximately five to seven minutes later. N.T. 6/15/04 at 9. Two police cruisers pulled behind Appellee's van and approached Appellee. N.T. 6/15/04 at 9. Mr. Stewart did not have contact directly with the police at this time. N.T. 6/15/04 at 10.

¶ 3 On cross-examination, Mr. Stewart reiterated that he did not speak to the police at the scene but admitted that he had spoken to the officers in the hallway prior to his testimony. N.T. 6/15/04 at 11–12.

¶ 4 Police Officer John McPhillips testified that he was operating a marked cruiser at the time in question and he was dispatched to the store "Media Play" to investigate an individual who was seen drinking an alcoholic beverage in his vehicle. N.T. 6/15/04 at 12–13, 30. The dispatcher described the vehicle as a gold Plymouth mini van, with a license plate number of EXX8164, and being operated by a white male, who was consuming alcoholic beverages. N.T. 6/15/04 at 13–14. As Officer McPhillips entered the store's parking lot, he saw a gold mini van, bearing the aforementioned license plate, executing a U-turn in front of the officer and pulling in front of the store. N.T. 6/15/04 at 14. Officer McPhillips activated his cruiser's lights, and the van started to pull away from the curb. N.T. 6/15/04 at 14. However, Corporal Smith, who had arrived in a separate cruiser, approached the van's driver's side window and Appellee stopped the van. N.T. 6/15/04 at 14. When Appellee exited the van, Officer McPhillips smelled alcohol, he asked Appellee to perform field sobriety tests, and Appellee failed the tests. N.T. 6/15/04 at 16–18. Officer McPhillips indicated that Appellee was disheveled, his eyes were glassy and bloodshot, and he admitted that he had consumed two beers. N.T. 6/15/04 at 19. Open containers of beer were in plain view and seized from the front operator's section of the van. N.T. 6/15/04 at 21.

¶ 5 Officer McPhillips informed Appellee that he was under arrest for driving while under the influence, handcuffed Appellee, and searched Appellee's person. N.T. 6/15/04 at 19. Officer McPhillips seized a small quantity of marijuana from Appellee's rear pant's pocket. N.T. 6/15/04 at 19. Appellee subsequently consented to a Breathalyzer test, which revealed scores of .079% and .066%, which were below the legal limit. N.T. 6/15/04 at 21. As such, Appellee was not charged with driving while under the influence; however, he was charged with respect to the possession of the marijuana, 35 Pa.C.S.A. § 780–113, and the restriction on possessing an open container of beer while operating a vehicle, 18 Pa.C.S.A. § 7513.[3] N.T. 6/15/04 at 21.

¶ 6 On cross-examination, Officer McPhillips testified that Appellee failed the walk and turn field sobriety test in that Appellee did not turn properly, and he failed the one-leg stand test in that he did not stand for the entire time and he cocked his knee. N.T. 6/15/04 at 27–28. Officer McPhillips testified that he stopped the van because the van and driver matched the description given to him by the 911 dispatcher. N.T. 6/15/04 at 28. Officer McPhillips admitted that he neither observed Appellee drinking in the van nor driving unsafely. N.T. 6/15/04 at 29. He further admitted that he did not speak to

---

**3.** We note that 18 Pa.C.S.A. § 7513 was repealed, effective February 1, 2004. However, since the offense in this case occurred on December 21, 2003, the statute as it existed prior to the repealment was in effect.

Mr. Stewart or observe any open containers in the van prior to stopping the van. N.T. 6/15/04 at 30. In fact, Officer McPhillips testified that he stopped Appellee's van solely on the basis of the information given to him by the 911 dispatcher. N.T. 6/15/04 at 29.

¶ 7 Corporal Richard L. Smith testified that he arrived at the store "Media Play" at the time in question in response to a 911 dispatch. N.T. 6/15/04 at 34. Corporal Smith indicated that the 911 dispatcher reported that a person was in a gold Plymouth mini van drinking alcohol in the parking lot. N.T. 6/15/04 at 35. Corporal Smith testified that a specific license plate number was given to the police via the dispatcher. N.T. 6/15/04 at 35. Corporal Smith indicated that, when he arrived at the scene, the van was starting to pull away from the curb, and, therefore, Corporal Smith ran to the driver's side window and pounded on it. N.T. 6/15/04 at 35. In response, Appellee, who was driving the van, stopped the van and exited it. N.T. 6/15/04 at 35. Before Appellee exited the vehicle, Corporal Smith observed through the window three open cans of beer in plain view. N.T. 6/15/04 at 36–37, 39. Corporal Smith observed as Appellee was arrested and searched by Officer McPhillips. N.T. 6/15/04 at 39. Corporal Smith confirmed that marijuana was seized from Appellee's pant's pocket. N.T. 6/15/04 at 39.

¶ 8 On cross-examination, Corporal Smith testified that he arrived on the scene within seconds of Officer McPhillips. N.T. 6/15/04 at 40.

¶ 9 Bruce Danner of the Dauphin County Emergency Management Agency testified that a 911 call was received at 1933 hours on December 21, 2003 from Charles Stewart, who provided his cell phone number. N.T. 6/15/04 at 42. Mr. Stewart indicated an old Voyager, with the license plate number of EXX8164, was in the Media Play parking lot, and a white forty year old male, who was approximately five feet seven inches tall, with a thin build and wearing a baseball cap, was sitting in the front seat drinking a beer when he pulled the van out of the parking lot and in front of the store. N.T. 6/15/04 at 42. Mr. Stewart told the dispatcher that there were beer cans on the dash and one in the driver's hand. N.T. 6/15/04 at 42. Mr. Stewart also told the dispatcher about the public urination he had witnessed. N.T. 6/15/04 at 43.

¶ 10 On cross-examination, Mr. Danner indicated that all of the information Mr. Stewart had given to the 911 dispatcher was relayed to the police officers as they were responding to the scene. N.T. 6/15/04 at 44. Upon further questioning, Mr. Danner admitted that the dispatcher did not tell the police specifically that the suspect was drinking and driving; but rather, the dispatcher told the police that a suspect was sitting in a van drinking beer. N.T. 6/15/04 at 44. Mr. Danner further admitted that the 911 records did not reveal whether the dispatcher had specifically given Mr. Stewart's identity to the police. N.T. 6/15/04 at 44.

¶ 11 On redirect-examination, Mr. Danner testified that the 911 records reveal the identity of the caller as Charles Stewart and provides his cell phone number. N.T. 6/15/04 at 45.

¶ 12 By opinion and order entered on December 30, 2004, the suppression court granted Appellee's motion to suppress. Specifically, although the suppression court found the Commonwealth's witnesses to be credible, the suppression court concluded the Commonwealth failed to prove the police had the requisite reasonable suspicion to stop Appellee's vehicle based on the tip provided to the police. The suppression court concluded that, without Of-

ficer McPhillip's and Corporal Smith's independent observations that a crime was being committed, the stop of Appellee's van and ensuing investigation were improper. The Commonwealth filed this timely appeal.[4] The lower court did not order the Commonwealth to file a Pa. R.A.P.1925(b) statement.

¶ 13 On appeal, the Commonwealth argues the police had reasonable suspicion to stop Appellee's vehicle on the basis that an identified caller informed the police of Appellee's public urination and the fact he was drinking an open container of beer while operating a van. The Commonwealth argues that the identified caller's specific description of Appellee's conduct, Appellee's van, and Appellee's person, combined with the police's immediate response and viewing of the van moving, was sufficient to stop Appellee's van for investigative purposes. We agree with the Commonwealth's argument.

When the Commonwealth appeals from a suppression order, we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the suppression court properly applied the law to the facts.

*Commonwealth v. Jones,* 845 A.2d 821, 824 (Pa.Super.2004) (quotation omitted).

¶ 14 The Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution protect individuals from unreasonable searches and seizures, thereby ensuring the "right of each individual to be let alone." *Commonwealth v. Blair,* 394 Pa.Super. 207, 575 A.2d 593, 596 (1990). To secure this right, courts in Pennsylvania require law enforcement officers to demonstrate ascending levels of suspicion to justify their interactions with citizens as those interactions become more intrusive.

The first of these is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond. The second, an "investigative detention," must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Finally, an arrest, or "custodial detention," must be supported by probable cause.

*Commonwealth v. Ellis,* 541 Pa. 285, 662 A.2d 1043, 1047 (1995) (citations and footnote omitted). *See Commonwealth v. Sands,* 887 A.2d 261 (Pa.Super.2005).

¶ 15 An investigative detention occurs when a police officer temporarily detains an individual by means of physical force or a show of authority for investigative purposes. *See Ellis, supra.* Such a detention constitutes a seizure of a person and thus activates the protections of the Fourth Amendment and the requirements of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

¶ 16 To determine whether the interaction rises to the level of an investigatory detention, we must discern whether, as a matter of law, the police

---

**4.** The Commonwealth has filed a motion to strike Appellee's supplemental reproduced record. We deny the motion.

conducted a seizure of the person involved. *See Ellis, supra.* In the case *sub judice,* the Commonwealth does not dispute that Officer McPhillips' and Corporal Smith's interaction with Appellee was an investigate detention when they initiated a stop of Appellee's van to investigate whether criminal activity was afoot. That is, when the officers stopped Appellee's vehicle to investigate the complaint of public urination and the fact he was driving a van while drinking an open container of beer, they effectively seized Appellee.

■ ¶ 17 The appellate courts have mandated that law enforcement officers, prior to subjecting a citizen to an investigatory detention, must harbor at least a reasonable suspicion that the person seized is then engaged in unlawful activity. *See Commonwealth v. Nagle,* 451 Pa.Super. 16, 678 A.2d 376 (1996). To meet this standard, the officer must point to specific and articulable facts which, together with the rational inferences therefrom, reasonably warrant the intrusion. *Id.* "In ascertaining the existence of reasonable suspicion, we must look to the totality of the circumstances to determine whether the officer had reasonable suspicion that criminal activity was afoot." *Commonwealth v. Wiley,* 858 A.2d 1191, 1194 (Pa.Super.2004), *appeal granted,* 583 Pa. 662, 875 A.2d 1075 (2005) (citation omitted).

■ ¶ 18 "To have reasonable suspicion, police officers need not personally observe the illegal or suspicious conduct, but may rely upon the information of third parties, including 'tips' from citizens." *Commonwealth v. Lohr,* 715 A.2d 459, 461 (Pa.Super.1998) (quotation omitted). "Naturally, if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable." *Wi-*

*ley,* 858 A.2d at 1194 (quotation and quotation marks omitted). This Court has examined the requirements surrounding reasonable suspicion for automobile stops emanating from information provided by a tipster and has explained:

> Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors—quantity and quality—are considered in the "totality of the circumstances—the whole picture," that must be taken into account when evaluating whether there is reasonable suspicion. Thus, if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were reliable.
>
> When the underlying source of the officer's information is an anonymous call, the tip should be treated with particular suspicion. However, a tip from an informer known to the police may carry enough indicia or reliability for the police to conduct an investigatory stop, even though the same tip from an anonymous informant would likely not have done so.

*Lohr,* 715 A.2d at 461–462 (quotation and citations omitted). Indeed, identified citizens who report their observations of criminal activity to police are assumed to be trustworthy, in the absence of special circumstances, since a known informant places himself at risk of prosecution for filing a false claim if the tip is untrue, whereas an unknown informant faces no such risk. *Commonwealth v. George,* 878 A.2d 881 (Pa.Super.2005); *Lohr, supra.*

> When an identified third party provides information to the police, we must examine the specificity and reliability of the information provided. The information supplied by the informant must be spe-

cific enough to support reasonable suspicion that criminal activity is occurring. To determine whether the information provided is sufficient, we assess the information under the totality of the circumstances. The informer's reliability, veracity, and basis of knowledge are all relevant factors in this analysis.

*Commonwealth v. Korenkiewicz,* 743 A.2d 958, 964 (Pa.Super.1999) *(en banc)* (citations omitted).

¶ 19 While, "[t]he reasonableness of official suspicion must be measured by what the officers knew before they conducted their search," *Wiley,* 858 A.2d at 1197 n. 4 (quotation, quotation marks, and emphasis omitted), "Pennsylvania law…permits a vehicle stop based upon a radio bulletin if evidence is offered at the suppression hearing to establish reasonable suspicion." *Korenkiewicz,* 743 A.2d at 964 (citations omitted). *See Commonwealth v. Chernosky,* 874 A.2d 123 (Pa.Super.2005) *(en banc)* (holding that an officer may conduct a seizure based upon a police radio broadcast). That is, it is not necessary that the officer stopping the automobile personally had the requisite reasonable suspicion.

[Rather,] [f]or a stop to be valid, someone in the police department must possess sufficient information to give rise to reasonable suspicion. The officer with the reasonable suspicion, usually the dispatcher, need not convey all of this background information to the officer who actually effectuates the stop. Thus, the police may justify the search by presenting sufficient evidence at the suppression hearing that someone in the chain of command had reasonable suspicion before the stop, even if the arresting officer did not.

This is not to say, however, that the Commonwealth may generate information giving rise to reasonable suspicion for the first time after the stop took place. In other words, even though the evidence of reasonable suspicion may be presented at a later suppression hearing, the police must have this evidence prior to the stop itself.

*Wiley,* 858 A.2d at 1197 n. 4 (citations and emphasis omitted). *See Korenkiewicz, supra.*

¶ 20 In the instant case, the information provided to the police was provided by an identified source, Charles Stewart.[5] The police received Mr. Stewart's identity, telephone number, and location through his 911 call. In that call, Mr. Stewart informed the police that a man had urinated in a public parking lot and was drinking beer while driving in the parking lot. He gave a specific description of Appellee's person and van, including the van's license plate number, and informed the police of the van's exact location. Within five to seven minutes, Officer McPhillips and Corporal Smith, who received information concerning the 911 call via their radios, responded to the location and saw a vehicle and driver matching the description in the radio bulletin at the exact location provid-

---

**5.** There was some confusion during the suppression hearing as to whether Officer McPhillips and Corporal Smith were personally provided with Mr. Stewart's identity prior to stopping Appellee's van or whether such information was provided to the 911 dispatcher only. Seizing upon this confusion, Appellee argues that Mr. Stewart's tip should be considered an "anonymous tip." Pursuant to the aforementioned legal precepts, we disagree and conclude that the fact Mr. Stewart specifically identified himself and his telephone number to the 911 dispatcher prior to the stopping of Appellee's van renders the tip at issue as being from an "identified caller." That is, it was not necessary for the 911 dispatcher to specifically relay this information to Officer McPhillips and Corporal Smith in order to establish reasonable suspicion. *Wiley,* supra.

ed by Mr. Stewart. We conclude the police had sufficient reason to believe Appellee and the van were the subjects of Mr. Stewart's report. *See Korenkiewicz, supra; Commonwealth v. Janiak,* 368 Pa.Super. 626, 534 A.2d 833 (1987). *Cf. Commonwealth v. Swartz,* 787 A.2d 1021 (Pa.Super.2001) (*en banc*) (holding that police did not have reasonable suspicion to stop vehicle over an hour and twenty minutes after receiving tip and traveling in an opposite direction from that given by tipster).

¶ 21 Further, the content of Mr. Stewart's report was not equivocal. Mr. Stewart specifically informed the police of Appellee's activities, including his public urination and drinking a beer while driving a van. *See Commonwealth v. Strickler,* 563 Pa. 47, 757 A.2d 884 (2000) (holding that observation of public urination provides reasonable suspicion). The record establishes that Mr. Stewart's report was the result of his ongoing personal observation. *See Commonwealth v. Krisko,* 884 A.2d 296 (Pa.Super.2005) (holding reasonable suspicion to stop vehicle established where tipsters gave names to 911 dispatcher and detailed report of first-hand information). Moreover, upon arrival at the scene, Officer McPhillips and Corporal Smith saw Appellee pulling his van away from the store's parking lot and about to enter traffic.

¶ 22 Based on the totality of the circumstances, we conclude Officer McPhillips and Corporal Smith were constitutionally authorized to execute a brief stop to maintain the status quo while they obtained more information. Their stop was based upon Mr. Stewart's 911 call, which was a reliable, appropriate basis for the officers' investigative stop. *Korenkiewicz, supra.*

¶ 23 We note we specifically find the case *sub judice* to be distinguishable from *Commonwealth v. Jones,* 845 A.2d 821 (Pa.Super.2004), upon which the suppression court relied in granting Appellee's motion to suppress. The suppression court reasoned that, pursuant to *Jones,* the officers in the case *sub judice* could not stop Appellee's vehicle without independent corroboration.

¶ 24 In *Jones,* an officer received a dispatch that a person had called in to report that a burgundy Chevrolet with a certain license plate number was involved in drug activity. The officer went to the location, saw the subject burgundy Chevrolet, and followed it. At some point, the vehicle stopped on its own accord, and the driver exited the vehicle. As the driver did so, the officer noticed the driver was holding many one hundred dollar bills. At this point, the officer activated his cruiser's lights and stopped the driver from walking away. At the suppression hearing, it was determined that, prior to the officer stopping the driver, dispatch knew the name of the tipster, although the officer did not. It was further determined that neither dispatch nor the officer had a description of the driver and the only information provided by the tipster was a description of the vehicle, including its license plate number, and the fact the vehicle was involved in "drug activity" in the 1100 block of Hanover Street.

¶ 25 In determining whether the officer had reasonable suspicion to stop the driver in *Jones,* a panel of this Court concluded that, although the police knew the name of the informant, such information alone was insufficient to serve as a basis for a stop. *Id.* at 825. Specifically, the panel concluded that the identity of the tipster alone was insufficient in light of the content of the information provided by the tipster to the police. *Id.* That is, the only information provided by the identified tipster was a description of a vehicle at a certain location which was allegedly "involved in drug

activity." *Id.* Without a more detailed explanation of the person and activity at issue, the panel concluded that the police did not have reasonable suspicion to stop the driver. *Id.* at 826. Specifically, the panel stated the officer "did not know what 'drug activity' was involved, or the identity, gender, race or number of individuals involved in the alleged activity. Consequently, this information cannot form the basis of a reasonable suspicion to support the detention of Jones." *Id.* at 826.

¶ 26 In the case *sub judice*, unlike in *Jones*, the identified caller (Mr. Stewart) gave a specific description of the vehicle, driver, and activity at issue. Mr. Stewart explained Appellee's act of public urination and drinking while driving a van, gave the specific location, and described Appellee's physical appearance to the police. Therefore, unlike the panel in *Jones*, we conclude the tip in this case was sufficiently specific and reliable such that Officer McPhillips and Corporal Smith had a reasonable suspicion to stop Appellee's van. Having so determined, we conclude the suppression court erred in granting Appellee's motion to suppress on this basis.[6]

¶ 27 Reversed; Remanded; Jurisdiction relinquished.

¶ 28 PJE McEWEN concurs in the result.

---

**6.** We note that the suppression court declined to review Appellee's remaining suppression issues since the issues were not specifically discussed in Appellee's brief in support of his motion to suppress. Suppression Court Opinion filed 12/30/04 at 4. To the extent the issues were not waived by Appellee, we simply note that we conclude the open containers of beer seized from Appellee's van were done so pursuant to the "plain view exception" and that Appellee's person was properly searched, and the marijuana was properly seized, incident to Appellee's arrest.