J-A16038-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| PAUL YEAGER | : | |
| | : | |
| Appellant | : | No. 2036 MDA 2019 |

Appeal from the Judgment of Sentence Entered December 12, 2019
in the Court of Common Pleas of Schuylkill County
Criminal Division at No(s):  CP-54-CR-0002114-2018

BEFORE:  PANELLA, P.J., STABILE, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:         **FILED NOVEMBER 19, 2020**

Paul Yeager ("Yeager") appeals from the judgment of sentence imposed following his conviction of four counts of driving under the influence of a controlled substance ("DUI").[1]  We affirm.

In its Opinion and Order, the suppression court set forth its findings of fact as follows:

> On June 8, 2018[, Yeager] was stopped in the Borough of Coaldale by Officer [Charles] Blesse [("Officer Blesse"),] who was employed by the Coaldale Police Department since 2006.  Officer Blesse was on routine patrol working the 11:00 p.m. to 7:00 a.m. shift.  Officer Blesse testified that he had extensive training to detect whether somebody is driving under the influence of drugs and had multiple opportunities to recognize the odor of burning marijuana.
>
> On June 8, 2018[,] Officer Blesse was in uniform, in a marked patrol car on Route 209[,] when he observed a tan sedan in front of him.  The weather was warm and Officer Blesse had the

---

[1] **See** 75 Pa.C.S.A. § 3802(d).

windows open. [Officer Blesse] testified that he detected a strong smell of burnt marijuana coming from the vehicle[,] as he followed the vehicle for a quarter to a half mile. After the vehicle turned and traveled the length of Bull Run Street, the [O]fficer activated his lights and sirens. The vehicle hit the curb as it pulled off the road way. [Officer Blesse] then made contact with the driver, who was the only person in the car. While getting license and registration information from [Yeager], the Officer continued to smell burnt marijuana.

Officer Blesse asked [Yeager] where the marijuana was. In response, [Yeager] produced a bag of green vegetable matter, a blunt, a vaping pipe and rolling papers. [Yeager] then voluntarily stated[,] "[A]s I was smoking, heading into town I had a feeling I was going to get stopped." He was then asked to exit the vehicle to allow the Officer to perform the Horizontal Gaze Nystagmus (HGN) field sobriety test[,] which [Yeager] reportedly failed. The Officer then concluded that [Yeager] was incapable of safely driving the vehicle.

After the test was completed, [Yeager] was placed under arrest, handcuffed and transported to St. Luke's [Hospital] for a blood draw[,] after which [Yeager] was released. The blood was then taken to the Coaldale Police Station and placed in the evidence refrigerator. Additional testimony revealed [that] the Coaldale Police transported the blood to the Pottsville Hospital laboratory for testing. The NMS Laboratory Report indicated [that Yeager's] blood contained amphetamines, methamphetamines, hydroxyl Delta-9 THC, Delta-9 Carboxy THC, and Delta-9 THC. [Officer Blesse] did not at any time read [Yeager] his ***Miranda***[2] [r]ights and had given him one field sobriety test.

Opinion and Order, 9/13/19, at 4-5 (footnote added).

On March 13, 2019, Yeager filed an Omnibus Pre-Trial Motion, including,

*inter alia*, a Motion for suppression of evidence. Yeager argued that he was

illegally stopped, detained, and searched. The suppression court conducted a

---

[2] ***See Miranda v. Arizona***, 384 U.S. 436 (1966).

hearing on the Omnibus Pre-Trial Motion on May 22, 2019. During the hearing, Yeager additionally challenged the chain of custody of the blood test, and argued that the statements he made to Officer Blesse should be suppressed because he was never advised of his *Miranda* rights. The suppression court permitted both parties to file a memorandum in support of their respective positions. Both parties complied. On September 13, 2019, the suppression court entered an Opinion and Order granting in part, and denying in part, Yeager's Omnibus Pre-Trial Motion. Specifically, the court suppressed all physical evidence obtained as a result of the vehicle stop, because Yeager had not been advised of his *Miranda* rights before Officer Blesse seized the evidence. However, the suppression court deemed admissible the statements Yeager made about smoking marijuana as voluntarily made, as well as the blood test results.

Yeager filed a Motion for Reconsideration, asking the suppression court to determine that the vehicle stop was not supported by probable cause. Yeager specifically asserted that an officer may not stop a vehicle based solely on the smell of marijuana, because medical marijuana is now legal in Pennsylvania. The suppression court dismissed Yeager's Motion for Reconsideration.

Following a bench trial on October 25, 2019, the trial court found Yeager

guilty of four counts of DUI.[3]  The trial court deferred sentencing and ordered

the preparation of a pre-sentence investigation report.  On December 12,

2019, the trial court sentenced Yeager to a term of 90 days to 5 years in

prison, with immediate eligibility for the Work Release Program at the

Schuylkill County Prison if he otherwise qualified.  The trial court also ordered

Yeager to serve 10 hours of community service, pay restitution totaling $577

for the blood testing, plus a fine and costs.

Yeager filed a timely Notice of Appeal and a court-ordered Pa.R.A.P.

1925(b) Concise Statement of errors complained of on appeal.

On appeal, Yeager raises the following issue for our review:

> Whether the smell of burnt marijuana is no longer a basis for the
> police to condu[c]t a traffic stop post-enactment of the
> Pennsylvania Medical Marijuana Act [("MMA")[4]], making the stop
> of [Yeager's] vehicle unlawful, and therefore[,] all evidence
> obtained as a result of the unlawful stop should have been
> suppressed by the [suppression] court?

Brief for Appellant at 4 (footnote added).

We are mindful of the following standard of review:

> An appellate court's standard of review in addressing a challenge
> to the denial of a suppression motion is limited to determining
> whether the suppression court's factual findings are supported by

---

[3] Yeager was also charged with possession of a small amount of marijuana
and use or possession of drug paraphernalia.  ***See*** 75 P.S. § 780-
113(a)(31)(i), (32).  Upon Motion by the Commonwealth, those charges were
*nolle prossed* prior to the start of trial.

[4] ***See*** 35 P.S. §§ 10231.101-10231.2110.

the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, the appellate court is bound by those findings and may reverse only if the court's legal conclusions are erroneous. Where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to plenary review.

*Commonwealth v. Jones*, 121 A.3d 524, 526-27 (Pa. Super. 2015) (citation, brackets and ellipses omitted).

Yeager claims that the smell of marijuana emanating from a vehicle does not, by itself, provide probable cause or reasonable suspicion to justify a warrantless vehicle stop. Brief for Appellant at 18. Yeager points out that under the MMA, Pennsylvanians can legally access medically-prescribed marijuana. *Id.* at 18-19. Yeager cites to several cases from other jurisdictions, which have considered the ramifications of the legalization of marijuana on Fourth Amendment jurisprudence. *Id.* at 19-24 (collecting cases). Additionally, Yeager analogizes the instant case to

*Commonwealth v. Hicks*, 208 A.3d 916 (Pa. 2019).[5]  Brief for Appellant at 25-27.  Yeager emphasizes Officer Blesse's testimony that his sole reason for stopping Yeager was the smell of burnt marijuana.  *Id.* at 27.  Yeager contends that because medical marijuana has been legalized in Pennsylvania, the smell of burnt marijuana may no longer be considered *per se* evidence that a crime is being committed.  *Id.* at 28-29.  Additionally, Yeager claims that Officer Blesse had no other reason to suspect that a DUI was occurring.  *Id.* at 29.

By way of background, we first set forth this Court's prior explanation of the interplay between the Controlled Substance Act ("CSA"), and the MMA (effective May 17, 2016):

> [T]he first statute is the CSA, which describes five schedules of controlled substances.  35 P.S. § 780-104.  In outlining the Schedule I substances, the [CSA] states:

---

[5] In **Hicks**, police stopped Hicks's vehicle in a gas station parking lot based on information that he was in possession of a firearm.  **Hicks**, 208 A.3d at 922. An officer restrained Hicks's arms and removed his handgun from his holster, and a search of the vehicle followed.  **Id.**  Police later determined that Hicks possessed a valid license to carry a concealed firearm, and he was not statutorily prohibited from possessing a firearm.  **Id.**  Relevantly, Hicks was not charged with firearms offenses.  **Id.**  The trial court denied suppression, reasoning that possession of a concealed weapon justifies an investigatory stop to determine whether the individual has a license.  **Id.** at 922-23. Ultimately, in evaluating whether carrying a concealed firearm could justify an investigative detention, the Pennsylvania Supreme Court first noted that an individual may legally carry a concealed firearm in public if he is licensed to do so.  **Id.** at 926.  The Court also noted it is impossible to ascertain an individual's licensing status from his appearance.  **Id.** at 937.  Following an extensive review of applicable Fourth Amendment jurisprudence, **see id.** at 930-36, the Court concluded that there is "no justification for the notion that a police officer may infer criminal activity merely from an individual's possession of a concealed firearm in public."  **Id.** at 936.

**§ 780-104.  Schedules of controlled substances**

(1) Schedule I—In determining that a substance comes within this schedule, the secretary shall find:  a high potential for abuse, no currently accepted medical use in the United States, and a lack of accepted safety for use under medical supervision.  The following controlled substances are included in this schedule:

* * *

(iv) Marihuana.

35 P.S. § 780-104(1)(iv) (effective June 12, 1972).

The second statute is the MMA, which states in its declaration of policy:

**§ 10231.102. Declaration of policy**

The General Assembly finds and declares as follows:

(1) Scientific evidence **suggests** that medical marijuana is one **potential therapy** that may mitigate suffering in some patients and also enhance quality of life.

(2) The Commonwealth is committed to patient safety. Carefully regulating the program which allows access to medical marijuana will enhance patient safety while research into its effectiveness continues.

(3) It is the intent of the General Assembly to:

(i) Provide a program of access to medical marijuana which balances the need of patients to have access to the latest treatments with the need to promote patient safety.

(ii) Provide a safe and effective method of delivery of medical marijuana to patients.

(iii) Promote high quality research into the effectiveness and utility of medical marijuana.

(4) It is the further intention of the General Assembly that any Commonwealth-based program to provide access to medical marijuana serve as a temporary measure, pending Federal approval of and access to medical marijuana through traditional medical and pharmaceutical avenues.

35 P.S. § 10231.102(1)-(4) (emphasis added). In essence, the MMA creates a **temporary** program for qualified persons to access medical marijuana, for the safe and effective delivery of medical marijuana, and for research into the effectiveness and utility of medical marijuana. *Id.*; 35 P.S. § 10231.301. Significantly, the MMA does not declare that marijuana is safe and effective for medical use; instead, the MMA is a temporary vehicle to access the substance pending research into its medical efficacy and utility. 35 P.S. § 10231.102(1)-(4).

Section 10231.303 of the MMA allows for the limited lawful use of medical marijuana, and pertinent to this case, Section 10231.304 emphasizes the unlawful use of marijuana:

### § 10231.304. Unlawful use of medical marijuana

**(a) General rule.**—Except as provided in section 303, section 704, Chapter 19 or Chapter 20, the use of medical marijuana is unlawful and shall, in addition to any other penalty provided by law, be deemed a violation of the CSA.

**(b) Unlawful use described.**—It is unlawful to:

(1) Smoke medical marijuana.

(2) Except as provided under subsection (c), incorporate medical marijuana into edible form.

(3) Grow medical marijuana unless the grower/processor has received a permit from the department under this act.

(4) Grow or dispense medical marijuana unless authorized as a healthy medical marijuana organization under Chapter 19.

(5) Dispense medical marijuana unless the dispensary has received a permit from the department under this act.

**(c) Edible medical marijuana.**—Nothing in this act shall be construed to preclude the incorporation of medical marijuana into edible form by a patient or a caregiver in order to aid ingestion of the medical marijuana by the patient.

35 P.S. § 10231.304. Further, the MMA states: "The growth, processing, distribution, possession and consumption of medical marijuana permitted under the MMA shall not be deemed a violation of the CSA" and "if a provision of the CSA relating to marijuana conflicts with a provision of the MMA, the MMA shall take precedence." 35 P.S. § 10231.2101. In other words, compliance with the MMA will not constitute a crime under the CSA.

*Commonwealth v. Jezzi*, 208 A.3d 1105, 1111-12 (Pa. Super. 2019)

(emphasis in original; footnotes and some brackets omitted).

Regarding the lawful use of medical marijuana, the Act provides, in relevant part, as follows:

**§ 10231.303. Lawful use of medical marijuana**

* * *

**(b) Requirements.**--The lawful use of medical marijuana is subject to the following:

* * *

(2) Subject to regulations promulgated under this act, medical marijuana may only be dispensed to a patient or caregiver in the following forms:

> (i) pill;

> (ii) oil;

> (iii) topical forms, including gels, creams or ointments;

> (iv) a form medically appropriate for administration by vaporization or nebulization, *excluding dry leaf or plant form*

*until dry leaf or plant forms become acceptable under regulations adopted under section 1202;*[FN]

(v) tincture; or

(vi) liquid.

---

[FN] 35 P.S. § 10231.1202. [Section 1202 allows the Department of Health to "promulgate regulations to effectuate recommendations made by the advisory board." *Id.*]

---

35 P.S. § 10231.303(b) (emphasis added); *see also id.* § 10231.1201(a) (providing for the establishment of a Medical Marijuana Advisory Board). Thus, at the time of its effective date of May 17, 2016, the MMA prohibited both smoking medical marijuana, and the use of dry leaf and plant forms of marijuana for vaporization.

On April 9, 2018, the advisory board issued its Final Report. *See id.* § 10231.1201(j)(4) (tasking the advisory board with, *inter alia*, "issu[ing] two years after the effective date of this section a written report to the Governor, the Senate and the House of Representatives."). Relevantly, the advisory board "recommend[ed] permitting medical marijuana to be dispensed in dry leaf or plant form, for administration by vaporization." Final Report, Pennsylvania Medical Marijuana Advisory Board, 4/9/18, at 13. In support of its recommendation, the advisory board explained that dry leaf and plant forms have a lower cost for patients, and allows for accurate dosage because its medical benefits can be felt within minutes. *Id.*

- 10 -

The Secretary of Health subsequently effectuated the advisory board's recommendations (including its recommendation concerning dry leaf and plant forms of marijuana), which were adopted at a public meeting held on April 9, 2018. *See* 48 Pa. Bull. 2898-2900 (May 12, 2018); *see also* 35 P.S. § 10231.1202 (providing that the Department of Health "may promulgate regulations to effectuation recommendations made by the advisory board[,]" and the Secretary of Health "shall issue notice in the Pennsylvania Bulletin … [which] shall include the recommendations of the advisory board and shall state the specific reasons for the decision of the secretary on whether or not to effectuate each recommendation."). The resulting temporary regulation defines "medical marijuana" as "[m]arijuana for certified medical use, limited to the following forms … [a] form medically appropriate for administration by vaporization or nebulization, *including* dry leaf or plant form for administration by vaporization." 28 Pa. Code § 1141.21 (expired) (emphasis added).[6] Further, dry leaf medical marijuana was not available until August 1, 2018, at the earliest. *See* Press Release, Wolf Administration: Phase-In Of Dry Leaf Medical Marijuana Starts Aug. 1 At Dispensaries (July 30, 2018), https://www.

---

[6] The temporary regulation became effective on May 17, 2018, and expired on May 12, 2020. *See* 35 P.S. § 10231.1107 (providing that temporary regulations promulgated under the MMA "shall expire not later than two years following the publication of the temporary regulation."). The General Assembly recently extended the "temporary regulations authorized and published" pursuant to sections 1107 and 2007 of the MMA, to remain in effect until November 20, 2021. *See* Act of Mar. 27, 2020, P.L., No. 10.

mediapa.gov/Pages/Health-Details.aspx?newsid=518 (explaining that the dry leaf form will be available at 16 dispensary locations starting August 1, 2018, and expanded to 28 locations the following week).

We now turn to the level of suspicion necessary to support a vehicle stop. The Motor Vehicle Code provides that "[w]henever a police officer … has reasonable suspicion that a violation of this title is occurring or has occurred, he may stop a vehicle … to secure such [] information as the officer may reasonably believe to be necessary to enforce the provisions of this title." 75 Pa.C.S.A. § 6308(b). "Thus, [section] 6308(b) requires only reasonable suspicion in support of a stop for the purpose of gathering information necessary to enforce the Vehicle Code violation." *Commonwealth v. Venable*, 200 A.3d 490, 498 (Pa. Super. 2018). Generally, a vehicle stop for suspicion of DUI may be based on reasonable suspicion, because such a stop may require further investigation. *See id.*; *see also Commonwealth v. Chase*, 960 A.2d 108, 116 (Pa. 2008) (stating that "[e]xtensive case law supports the conclusion [that] a vehicle stop for DUI may be based on reasonable suspicion, as a post-stop investigation is normally feasible.").

"In ascertaining the existence of reasonable suspicion, we must look to the totality of the circumstances to determine whether the officer had reasonable suspicion that criminal activity was afoot." *Commonwealth v. Barber*, 889 A.2d 587, 593 (Pa. Super. 2005) (citation and quotation marks omitted). "[W]e must accord due weight to the specific reasonable inferences

that [Officer Blesse] is entitled to draw from the acts in light of his experience." ***Commonwealth v. Walls***, 206 A.3d 537, 541 (Pa. Super. 2019) (citation and quotation marks omitted).

During the suppression hearing, Officer Blesse testified that on June 8, 2018, at approximately 11:56 p.m., he was on routine patrol, and was driving behind a vehicle traveling eastbound on State Route 209. N.T. (Suppression), 5/22/19, at 7-8, 21. Officer Blesse stated that the windows of his patrol car were down, and the driver's side window of the vehicle was also rolled down. ***Id.*** at 8-9. Officer Blesse testified that he followed the vehicle for approximately a quarter of a mile to a mile, and "smelled an odor of burnt marijuana." ***Id.*** at 8; ***see also id.*** at 38 (wherein Officer Blesse stated that he was traveling at least four car lengths behind Yeager's vehicle).

According to Officer Blesse, the vehicle turned right onto Bull Run Street, and he followed the vehicle the length of that street, about a quarter of a mile. ***Id.*** at 9. The vehicle then made a left turn onto West Phillips Street, at which time Officer Blesse followed and activated his emergency lights and sirens to initiate a traffic stop. ***Id.***; ***see also id.*** at 11 (wherein Officer Blesse testified that he could smell marijuana "for a good portion of a mile" while he was traveling behind Yeager). Officer Blesse stated, "While behind him while he made the left turn, I was able to verify that his window was, in fact, down. And I did see smoke coming out of that window. I did continue to smell the marijuana coming from the vehicle the entire time." ***Id.***; ***see also id.***

(explaining that he could identify the smell of marijuana because it has a "distinct smell[,]" and he has been trained in drug recognition and identification). *But see id.* at 22-23, 25 (wherein defense counsel refreshed Officer Blesse's recollection with the transcript from the preliminary hearing, during which Officer Blesse had stated that he did not see smoke coming out of the window).

Thus, the record reflects that Officer Blesse initiated the traffic stop based solely on the odor of burnt marijuana, emanating from the vehicle's open driver's side window, which he detected while following Yeager's vehicle. *See* N.T. (Suppression), 5/22/19, at 8, 9, 11. The MMA specifically prohibits smoking medical marijuana. 35 P.S. § 10231.304. At the time of the traffic stop on June 8, 2018, the temporary regulations permitting the use of dry leaf marijuana for vaporization was in effect, but dry leaf medical marijuana was not yet available for purchase at dispensaries. *See* 28 Pa. Code § 1141.21; Press Release, *supra*. Accordingly, at the time of the stop in the instant case, Yeager could not have produced the odor of burnt marijuana through a use permitted under the MMA,[7] and the smell alone could give rise to "reasonable

---

[7] *See generally Commonwealth v. Barr*, 2020 WL 5742680, at *16 n.10 (Pa. Super. filed September 25, 2020) (wherein this Court credited an expert witness's testimony that vaporizing medical marijuana produces the same odor as burning marijuana). Further, Yeager makes no attempt to argue that he was using any form of medical marijuana at the time of the stop, nor did he produce a medical marijuana identification card.

suspicion that criminal activity was afoot." ***Barber***, 889 A.2d at 593.[8, 9]  Thus,

Yeager is not entitled to relief on his claim.

Accordingly, we affirm Yeager's judgment of sentence.[10]

Judgment of sentence affirmed.

_____

[8] Our conclusion is limited to the time period *prior* to the effectuation of the temporary regulations under the MMA, and the availability of the dry leaf and plant forms of medical marijuana for vaporization.

[9] We are cognizant of this Court's recent decision in ***Barr***, 2020 WL 5742680 (Pa. Super. filed September 25, 2020), wherein police initiated a traffic stop, then conducted a search based on the odor of burnt and raw marijuana emanating from the vehicle's window.  ***Barr***, 2020 WL 5742680, at **1-2; ***see also id.*** at *2 (stating that Barr, a passenger in the vehicle, produced a medical marijuana identification card after the police advised the occupants of their intention to search the vehicle).  After considering the provisions of the MMA, the ***Barr*** Court explained that "[t]he MMA has clearly altered the underlying factual context in which that probable cause test applies." ***Id.*** at *9.  This Court held that "[t]he odor of marijuana alone, absent any other circumstances, cannot provide individualized suspicion of criminal activity." ***Id.*** at *17; ***see also id.*** at *18 (stating that "the odor of marijuana may contribute to a finding of probable cause, as possession of marijuana remains illegal generally, the odor alone does not imply individualized suspicion of criminal activity.").  Further, applying the reasoning of ***Hicks***, this Court noted that "police cannot distinguish between contraband marijuana and medical marijuana legally consumed by a substantial number of Pennsylvanians based on odor alone…." ***Id.*** at *16.  Importantly, in contrast to the instant case, the stop and search at issue occurred *after* the enactment of the temporary regulation permitting the use of dry leaf or plant forms medical marijuana for vaporization, and after dry leaf marijuana became available in dispensaries.

[10] Moreover, we observe that the MMA has not altered the Motor Vehicle Code's prohibition on driving under the influence of controlled substances, including marijuana.  ***See*** 75 Pa.C.S.A. § 3802(d)(1)(i) (providing that "[a]n individual may not drive, operate or be in actual physical control of the movement of a vehicle," where the individual's blood contains *any* amount of a Schedule I controlled substance, as defined in the CSA).

President Judge Panella joins the memorandum.

Judge Stabile files a concurring memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/19/2020