J-A05005-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| DERRICK HARPER, | |
| Appellee | No. 3137 EDA 2014 |

Appeal from the Order Entered October 6, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0003051-2014
and CP-51-CR-0003116-2014

BEFORE:  OLSON AND OTT, JJ. and STEVENS, P.J.E.*

MEMORANDUM BY OLSON, J.:                    **FILED MAY 04, 2016**

The Commonwealth appeals as of right, under Pennsylvania Rule of Appellate Procedure 311(d), from an interlocutory order of court entered on October 6, 2014, granting the motion to suppress physical evidence that was filed by Derrick Harper (hereinafter "Harper").  We vacate the trial court's order and remand.

On September 26, 2014, the trial court held a hearing on Harper's pre-trial motion to suppress all physical evidence.  **See** N.T. Suppression Hearing, 9/26/14, at 4.[1]  The trial court has provided us with an able and

---

[1] The certified record does not contain Harper's motion to suppress. However, during the suppression hearing, Harper's counsel declared that the evidence against him must be suppressed because:  Harper was subjected to an illegal investigatory detention that lacked reasonable suspicion; the initial search of the vehicle was illegal; the four corners of the search
*(Footnote Continued Next Page)*

*Former Justice specially assigned to the Superior Court.

well-written summary of the evidence that was presented during the suppression hearing. As the trial court explained:

> [Philadelphia Police] Officer John Ellis [was the sole witness to testify at the suppression hearing. As Officer Ellis testified,] . . . on December 30, 2013[,] at approximately 3:29 [p.m.], [Officer Ellis] . . . , a then [ten-year] veteran of the police force and his partner, [P]olice [O]fficer Thomas Rosinski . . . , responded to a radio call about a shooting at 2148 Nedro [Avenue], [in Philadelphia]. At approximately 4:00 [p.m.], [the officers] arrived at Albert Einstein Hospital . . . , where the shooting victim was being treated[.[2]]
>
> Officer Ellis testified that upon arriving at the hospital, a security guard, Lieutenant Johnson, informed him that ["there were three males that just left the [emergency room]," that] one of [the] three males [had a gun, and that the three males were in a blue Mercury automobile that was in the parking lot.] Officer Ellis at the preliminary hearing could not recall whether, at the time the security guard told him about the gun, he was advised that this gun information actually came from a "patron inside the hospital[,]" but he later testified that he did not know how [Lieutenant] Johnson got the information. Further, Officer Ellis claimed he never asked Lieutenant Johnson for the basis of his knowledge about the gun or men.
>
> [Harper] was not specifically identified as the person carrying a gun by [Lieutenant] Johnson or any civilian. Moreover, Officer Ellis did not receive any further

_(Footnote Continued)_ ———————————

warrant did "not contain the requisite probable cause for a search of . . . [the] automobile;" and, the search warrant contained material misstatements. N.T. Suppression Hearing, 9/26/14, at 4-8.

[2] The victim was shot in the head and, after he was taken to Albert Einstein Medical Center, the victim was pronounced dead at 4:11 p.m. Application for Search Warrant and Affidavit, 1/2/14, at 2.

information regarding the men or a gun from the security officer or any civilian witnesses.

[Officer] Ellis, [Officer Rosinski], Lieutenant Johnson[,] and other hospital security staff[] then walked out [into the parking lot. According to Officer Ellis, he scanned the parking lot and saw a blue Mercury automobile with three people inside. Officer Ellis testified that he] approached the parked blue car, with his weapon drawn, and the person sitting in the front passenger seat, later identified as [Harper], immediately exited the vehicle[] and walked toward [Officer] Ellis and the others. [As Officer Ellis testified, he did not say anything to Harper at this time. Rather, Harper was the first to speak. Officer Ellis testified: "[after Harper exited the vehicle, [Harper] immediately walked over towards me because now at this time the gap is closing between me and the car and me and Mr. Harper. He gets out and he starts talking to me about – he just starts spilling about his – that's my brother in there – along those lines. . . . I mean, he was very frantic.] . . . [Harper] was "frantic" . . . because he was the brother of the shooting victim and wanted to know what was going on [with his brother in the hospital]. . .]. A short time later, the other car occupants exited the vehicle. . . .

[Officer Ellis] did not observe any indicia that any of the men had a weapon. [Officer] Ellis did not observe any criminal activity by [Harper] or the other two men at this time. [Officer] Ellis did not, at any time, ask Lieutenant Johnson which of the three men allegedly carried the gun that precipitated the approach. Officer Ellis first frisked [Harper] and then the driver, and either [Officer Ellis] or his partner also frisked the rear passenger, and they did not find a gun or holster on any of them. . . .

At the time of the frisks, Lieutenant Johnson was present with [Officer] Ellis, albeit slightly behind him. No one came forward to identify which man allegedly possessed the firearm. There was no testimony that[,] at any time prior to these frisks[,] [] Officer Ellis ask[ed] Lieutenant Johnson which of the three men was the one [that] had been carrying a gun.

The driver provided his license upon [Officer Ellis'] request. The three men complied with [Officer Ellis'] requests.

After finding no gun on any of the men, [Officer] Ellis continued to request information from one or more of them beginning with the driver's license and registration. He obtained the licenses of the [] men after asking for them as he continued investigating the vehicle. [Officer] Ellis separately said that he was detaining the three men because he was investigating them about the homicide. [Officer] Ellis testified that he realized that [Harper] had something to do with the homicide he was investigating. . . .

Instead of placing the men in his police car because he apparently found it inconvenient to retrieve his police car from a neighboring car lot, [Officer] Ellis decided to put them back in the vehicle. [Officer] Ellis intended for the three men to return to the car in a secure location where "I could have them sitting down and they weren't standing up and able to run or creating any kind of problem" during what he termed a "vehicle investigation." He wanted to make sure the car [was not] stolen.

However, before permitting them to re-enter the vehicle, [Officer Ellis] opened the front passenger car door to conduct a search. . . .

Upon opening the front passenger door and bending down, [Officer Ellis] testified that he could see a gun underneath the front passenger seat with no mention of the gun being in plain view. He then placed the men in handcuffs, placing [Harper] under arrest and detaining the other two men, and called for a search warrant. . . .

The search warrant[,] prepared by [Detective John Bartol,] stated [that] "police performed a cursory check of the vehicle before allowing the males back in the vehicle[]" and "observed a black semi[-]automatic handgun from under the front passenger seat." The warrant did not mention that Officer Ellis actually opened the door and peered underneath the front passenger seat before he could see the handgun.

Trial Court Opinion, 3/23/15, at 2-5 (internal citations omitted).

During the suppression hearing, both the Commonwealth and Harper introduced the Application for Search Warrant and Affidavit of Probable Cause into evidence. ***See***, ***e.g.***, N.T. Suppression Hearing, 9/26/14, at 75 and 76. The application declared that the blue Mercury Marquis automobile was owned by an individual named Malcolm Guillaume Garland. Application for Search Warrant and Affidavit, 1/2/14, at 1.

Following the suppression hearing, the trial court took the matter under advisement and, on October 6, 2014, the trial court entered an order granting Harper's motion to suppress all evidence. During the October 6, 2014 proceeding, the trial court explained its reasoning in open court:

> I believe that the tip was an anonymous tip. There was not enough further corroboration of it, no clothes, *et cetera*. He did point to the people in the car, but there were four [sic] of them. I think the officer was – if he had said which guy, I think he would've been in a better position. Even with that, no description of clothing, *et cetera*. And we don't know who was carrying the gun. So if he had pointed that out, it may've been a little bit better, but it wasn't.
>
> There was no probable cause for any of the searches, not even reasonable suspicion for the pat down as far as I'm concerned. I think the whole thing was a pretext. I think the officer wanted into that car, and he did all he could to get in and finally did.
>
> So with that tip being insufficient, everything else falls. The motion is granted as to all evidence.

N.T. Hearing, 10/6/14, at 4-5.

The trial court also issued an opinion where it more fully explained its factual findings and legal conclusions.[3]  Of note, the trial court found as a fact that:[4]

_____

[3] In the trial court's opinion, when analyzing Harper's expectation of privacy in the vehicle, the trial court declared:  "we do not find the testimony presented by Officer Ellis credible describing his actions and statements in the hospital parking lot.  The Commonwealth fell far short of showing [Harper] had no reasonable expectation of privacy and it failed to meet its burden of proof that the *Terry* [*v. Ohio*, 392 U.S. 1 (1968)] search of the vehicle was legal."  Trial Court Opinion, 3/23/15, at 7.  While the trial court broadly declared that it did "not find the testimony presented by Officer Ellis credible describing his actions and statements in the hospital parking lot," Officer Ellis was the only witness to testify during the suppression hearing and the trial court expressly concluded that large portions of Officer Ellis' testimony "describing his actions and statements in the hospital parking lot" were, in fact, true.  *See*, *e.g.*, Trial Court Opinion, 3/23/15, at 1-10.  Thus, and contrary to the trial court's broad and vague statement, the trial court indeed credited the majority of Officer Ellis' testimony.

We read the trial court's broad and vague statement that it did "not find the testimony presented by Officer Ellis credible describing his actions and statements in the hospital parking lot," to mean that, **at times**, it found that Officer Ellis was not credible when the officer testified to "his actions and statements in the hospital parking lot."  The specific instances where the trial court found Officer Ellis not credible were noted by the trial court and are recounted in the body of this memorandum, *supra*.  Nevertheless, at this time, we note that the trial court found Officer Ellis not credible in the following instances:  1) contrary to Officer Ellis' suppression hearing testimony, when Lieutenant Johnson told Officer Ellis "there were three males that just left the [emergency room]" and one of the three males "had a gun," Officer Ellis knew that Lieutenant Johnson's information did not come from  personal observation, but rather came from an anonymous tip; 2) contrary to Officer Ellis' suppression hearing testimony, when Officer Ellis decided to place Harper and the other two individuals in the blue Mercury Marquis to await his investigation, Officer Ellis did so as "a pretext for searching" the vehicle; and, 3) contrary to the search warrant application, the firearm was not in plain view in the automobile, but was rather hidden underneath the front passenger seat of the car.  *Id.* at 7, 8, and 9-10.

- when Lieutenant Johnson told Officer Ellis "there were three males that just left the [emergency room]" and one of the three males "had a gun," Officer Ellis knew that Lieutenant Johnson's information did not come from  personal observation, but rather came from an anonymous tip; Trial Court Opinion, 3/23/15, at 8;[5]

*(Footnote Continued)* _____

[4] Since the trial court granted Harper's motion to suppress, our standard of review demands that we "we [] consider only the evidence of the defense and so much of the evidence for the Commonwealth as remains uncontradicted when read in the context of the record as a whole." ***Commonwealth v. Mistler***, 912 A.2d 1265, 1268-1269 (Pa. 2006). Viewing the record in this light, the evidence supports all of the trial court's factual conclusions that we recount in the body of this memorandum. However, some of the trial court's factual conclusions required that the court render a decision upon conflicting and/or ambiguous evidence.  In the following summary, we will note where the trial court was required to arrive at a factual conclusion based upon conflicting and/or ambiguous evidence.

[5] Viewing the record in the requisite light, the evidence supports the trial court's factual conclusion that Officer Ellis knew that Lieutenant Johnson's information did not come from personal observation, but rather came from an anonymous tip.  At the outset, it is true Officer Ellis testified at the suppression hearing that, when he was first approached by Lieutenant Johnson, Lieutenant Johnson did not tell Officer Ellis how Lieutenant Johnson learned there was a "man with a gun."  ***See*** N.T. Suppression Hearing, 9/26/14, at 36.  However, during cross-examination, defense counsel confronted Officer Ellis with his prior testimony during Harper's preliminary hearing.  Officer Ellis testified:

> [Q:] We talked a little bit earlier on cross-examination that – do you remember, going back to [the preliminary hearing where you testified] "[i]n fact, your information from the security guard was that it wasn't him that observed the gun; it was a patron inside the hospital," correct[?]
>
> Do you remember being asked about that question that you were asked at the preliminary hearing?

*(Footnote Continued Next Page)*

- 7 -

- when Officer Ellis approached the parked, blue Mercury Marquis, Officer Ellis had "his weapon drawn;" *id.* at 3;[6]

*(Footnote Continued)* ─────────────

> [A:] Yes, and I responded yes.  I responded to your question.
>
> I said, "Yes, that's what I said."
>
> I said, "Yeah, however, I got the information, I don't know."
>
> It says, "However I got the information; I don't know exactly – I don't exactly recall how the security guard told me because it happened so fast."
>
> I don't know how he said it.  All I know is that he said it to me.  I can't sit here and tell you the exact words that he said to me.

*Id.* at 68.

Although Officer Ellis' above testimony is fairly ambiguous, the trial court resolved the ambiguity and interpreted this testimony to mean that, when Lieutenant Johnson approached Officer Ellis and told him that an individual in a blue Mercury automobile had a gun, Officer Ellis was aware "that the information source about [the] gun was an anonymous tipster."  Trial Court Opinion, 3/23/15, at 8.  Given the ambiguity in Officer Ellis' testimony, the trial court's factual finding is supported by the record and binding upon this Court.

[6] Viewing the record in the requisite light, the evidence supports the trial court's factual conclusion that, when Officer Ellis approached the parked, blue Mercury Marquis, Officer Ellis had "his weapon drawn."  Specifically, during Officer Ellis' suppression hearing testimony, the following exchange took place:

> Q: And when the other two [men] exited the [blue Mercury Marquis], where did they go?

*(Footnote Continued Next Page)*

- when Harper initially approached Officer Ellis and said "that's my brother in there," Officer Ellis believed Harper's statement and, thus, believed "that [Harper] was the brother of a gunshot victim who was frantic/agitated and understandably concerned for his brother's life;" *id.* at 9;

- Harper "was not specifically identified as the person carrying a gun by [Lieutenant] Johnson or any [other] civilian;" *id.* at 3;

*(Footnote Continued)* ─────────────────

> A: They walked over towards us a little slower than Mr. Harper did that day.
>
> Q: And at that point, how many officers were on scene, when you had three males walking towards you?
>
> A: Just my partner and I and the security guards were behind us.
>
> Q: At that point, did you have your gun drawn?
>
> A: No, I did.

N.T. Suppression Hearing, 9/26/14, at 41.

Officer Ellis' answer "[n]o, I did," to the question "did you have your gun drawn," is ambiguous on paper. However, the trial court heard Officer Ellis' live testimony and interpreted Officer Ellis' testimony to mean that he did, in fact, have his gun drawn when he initially approached Harper. Trial Court Opinion, 3/23/15, at 3. This interpretation is supported by the record and binding on this Court, even though, during cross-examination, Officer Ellis answered "Yes" to the following question posed by Harper's counsel: "You're in full uniform that also includes – you didn't have your firearm drawn, but both you and your partner have a firearm, correct?" N.T. Suppression Hearing, 9/26/14, at 54.

- prior to the frisk of Harper and the two other individuals, Officer Ellis "did not observe any indicia that any of the men had a weapon" and "did not observe any criminal activity by [Harper] or the other two men;" *id.*;

- the frisk of Harper and the two other individuals did not produce a weapon or a holster; *id.*;

- Harper and the other two individuals were compliant with Officer Ellis throughout the entire interaction; *id.* at 9;

- following the frisk, Officer Ellis continued to detain Harper and the other individuals "because he was investigating them about the homicide . . . [and because] he wanted to make sure the vehicle [in which the men had exited] wasn't stolen;" *id.* at 4;

- Officer Ellis had no reason to suspect that the car was stolen; *id.* at 4, 9, and

- when Officer Ellis decided to place Harper and the other two individuals in the blue Mercury Marquis to await his investigation, Officer Ellis did so as "a pretext for searching" the vehicle; *id.* at 4.[7]

_____

[7] Viewing the record in the requisite light, the evidence supports the trial court's determination that, when Officer Ellis decided to place Harper and the other two individuals in the blue Mercury Marquis automobile, he did so as "a pretext for searching" the vehicle. Trial Court Opinion, 3/23/15, at 4. As the trial court explained, Officer Ellis "could have placed them in his squad car while he waited to obtain a search warrant." *Id.* Therefore, since the trial court's factual finding is supported by the record, it is binding upon this Court.

At this point we note that, notwithstanding the trial court's factual finding that Officer Ellis had "his weapon drawn" when he approached the blue Mercury Marquis automobile, there is no evidence in this case that, when the officer approached the automobile, the officer had his weapon pointed in the direction of either Harper or the automobile. *See* N.T. Suppression Hearing, 9/26/14, at 1-80. Further, with respect to the initial encounter between Officer Ellis and Harper, we note that the uncontradicted evidence in this case demonstrates: that Harper initiated the contact with the officers while Officer Ellis remained a considerable, but unspecified, distance away from the blue Mercury; that Harper spoke to the officers before he was spoken to; and, that, before Officer Ellis said anything, Harper identified himself as the brother of the shooting victim who was inside the hospital. Officer Ellis testified:

> Q: And when you were walking towards the parking lot, did you observe anything?
>
> A: I did; Mr. Harper.
>
> Q: Where was he when you first saw him?
>
> A: He was in the front passenger's seat of the blue Mercury in the parking lot.
>
> Q: Was he alone in that vehicle or were there other people?
>
> A: No, there was two others. There was a driver, and there was a passenger directly behind the front passenger's seat that Mr. Harper was in.
>
> . . .

- 11 -

Q: And when you said you saw [Harper] in the front passenger's seat, what did he do next?

A: I looked in the direction of the sedan, the Mercury, and immediately upon me walking over towards that direction that's when Mr. Harper exited the vehicle.

Q: Were you yelling at Mr. Harper, "Get out of the vehicle; get out of the vehicle"?

A: No. I was far away. I couldn't have.

. . .

Q: As you were walking towards the vehicle, were you yelling anything at all?

A: Nothing at all.

Q: And you said that Mr. Harper exited the vehicle; is that correct?

A: Yes.

Q: When he exited the vehicle, what did he do?

A: He immediately walked over towards me because now at this time the gap is closing between me and the car and me and Mr. Harper. He gets out and he starts just talking to me about – he just starts spilling about his – that's my brother in there – along those lines. I can't sit here and tell you exactly what he said, but it was along the lines of that's my brother in there and what's going on.

Q: And what was his demeanor like when he approached you and was saying that?

A: I mean, he was very frantic. You know, he wants to know what's going on. His demeanor, like, initially when I started approaching, walking to the car was – he was the first one out of the car quickly. He walked right over to me and just started, like, you know, asking me questions about – you know, that's my brother; what's going on. . . .

Q: So you said he got out of the car first. The other two males, where did they go?

A: They exited the car. [Harper] was the first one out and up and towards me. And then the other two exited.

Q: And when the other two exited the car, where did they go?

A: They walked over towards us a little slower than Mr. Harper did that day.

. . .

Q: Once the three males were walking towards you, what did you do next?

A: Well, the first thing I did was I had contact with Mr. Harper and stopped him, slowed him down.

I said, "Okay, stop."

Right then and there in the parking lot, I said, "Hey man, what's going on; I don't know what's going on."

And I performed a pat down immediately on Mr. Harper.

N.T. Suppression Hearing, 9/26/14, at 38-42.

With respect to the trial court's legal conclusions, the trial court held that: Officer Ellis did not have reasonable suspicion to perform the initial frisk of Harper; Officer Ellis did not have reasonable suspicion to detain Harper following the initial frisk; and, Harper had a reasonable expectation of privacy in the blue Mercury Marquis, which Officer Ellis violated when he searched the vehicle without a warrant. *Id.* at 1-10.

Following the trial court's suppression order, the Commonwealth filed an interlocutory appeal as of right, pursuant to Pennsylvania Rule of

Appellate Procedure 311(d).[8]  On appeal, the Commonwealth raises two

claims:

> [1.] Did the [trial] court commit an error of law when it
> concluded that [Harper] had a reasonable expectation of
> privacy in a car, registered to someone else, in which he
> was a passenger?
>
> [2.] In any event, did the [trial] court err when it concluded
> that police lacked reasonable suspicion justifying a
> protective search of the car where the vehicle was parked at
> a hospital at which a shooting victim had just arrived, a
> hospital patron told security that one of the men in the car
> had a gun, and [Harper] exited the car and approached
> police in a frantic manner?

Commonwealth's Brief at 3.

"Once a motion to suppress evidence has been filed, it is the

Commonwealth's burden to prove, by a preponderance of the evidence, that

the challenged evidence was not obtained in violation of the defendant's

rights."  **Commonwealth v. Wallace**, 42 A.3d 1040, 1047-1048 (Pa.

Super. 2012) (*en banc*); **see also** Pa.R.Crim.P. 581(H).  If the defendant

prevails in the underlying proceeding, we review the suppression court's

order under the following standard and scope of review:

> When reviewing an [o]rder granting a motion to suppress
> we are required to determine whether the record supports
> the suppression court's factual findings and whether the
> legal conclusions drawn by the suppression court from those

---

[8] Within its notice of appeal, the Commonwealth properly certified that the trial court's suppression order will terminate or substantially handicap the prosecution.  Notice of Appeal, 11/5/14 at 1; **see also** Pa.R.A.P. 311(d).

findings are accurate. In conducting our review, we may only examine the evidence introduced by [the defendant] along with any evidence introduced by the Commonwealth which remains uncontradicted. Our [standard] of review over the suppression court's factual findings is limited in that if these findings are supported by the record we are bound by them.

*Commonwealth v. Henry*, 943 A.2d 967, 969 (Pa. Super. 2008) (internal citations omitted). "It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony." *Commonwealth v. Gallagher*, 896 A.2d 583, 585 (Pa. Super. 2006). Moreover, we note that our scope of review from a suppression ruling is limited to the evidentiary record that was created at the suppression hearing. *In re L.J.*, 79 A.3d 1073, 1087 (Pa. 2013).

The Commonwealth first claims that the trial court erred when it held that Harper had a reasonable expectation of privacy in the blue Mercury Marquis automobile, as the vehicle was registered to another individual and Harper produced no evidence that he had an expectation of privacy in the vehicle. Commonwealth's Brief at 8. We agree with the Commonwealth.

As this Court has explained:

Both Article 1, Section 8 of the Pennsylvania Constitution and the Fourth Amendment of the United States Constitution have been interpreted as protecting zones where an individual enjoys a reasonable expectation of privacy. *Commonwealth v. Parker*, 619 A.2d 735, 737 (Pa. Super. 1993). While the Pennsylvania Constitution may be employed to guard individual privacy rights against unreasonable searches and seizures more zealously than the federal law, an individual's expectation of privacy in the place searched must be established to invoke constitutional protection. *Commonwealth v. Melilli*, 555 A.2d 1254,

1258 (Pa. 1989). "[I]n order for a defendant accused of a possessory crime to prevail in a challenge to the search and seizure which provided the evidence used against him, he must, as a threshold matter, establish that he has a legally cognizable expectation of privacy in the premises which were searched." *Commonwealth v. Strickland*, 707 A.2d 531, 534 (Pa. Super. 1998), *quoting* *Commonwealth v. Carlton*, 701 A.2d 143, 145-146 (Pa. 1997).

*Commonwealth v. Viall*, 890 A.2d 419, 421-422 (Pa. Super. 2005) (parallel citations omitted). "An expectation of privacy will be found to exist when the individual exhibits an actual or subjective expectation of privacy and that expectation is one that society is prepared to recognize as reasonable." *Id.* at 422.

During the suppression hearing, both Harper and the Commonwealth introduced the search warrant into evidence – and the search warrant expressly declared that the registered owner of the blue Mercury Marquis automobile was an individual named Malcolm Guillaume Garland. Application for Search Warrant and Affidavit, 1/2/14, at 1. Harper neither testified at the suppression hearing nor introduced any evidence to demonstrate that, contrary to the evidence of record, he: owned the vehicle, had permission to drive the vehicle, or otherwise had an expectation of privacy in the vehicle. *See* N.T. Suppression Hearing, 9/26/14, at 1-73.

As this Court has continuously held, where the Commonwealth has come forward with evidence that the defendant was a passenger or a non-owner of a vehicle, and where the defendant does not establish that he owned the vehicle, had permission to drive the vehicle, or otherwise had an

expectation of privacy in the vehicle, the defendant simply cannot satisfy his burden of establishing that he had a protected privacy interest in the automobile. *See Commonwealth v. Jones*, 874 A.2d 108, 120 (Pa. Super. 2005) (holding: where the defendant was the driver of a rental car, the defendant did not have an expectation of privacy in the car because the "return date [on the rental automobile] had expired, [the defendant] was not the named lessee, the named lessee was not in the automobile, and [the defendant] was not authorized to drive the automobile"); *Commonwealth v. Burton*, 973 A.2d 428, 436 (Pa. Super. 2009) (*en banc*) (holding that the defendant did not have an expectation of privacy in a vehicle, where he did not own the vehicle and where he "offered no evidence to explain his connection to the vehicle or his connection to the registered owner of the vehicle"); *Commonwealth v. Cruz*, 21 A.3d 1247, 1251-1252 (Pa. Super. 2011) (holding that the defendant did not demonstrate that he had an expectation of privacy in the vehicle he was driving at the time of the valid stop because the defendant "presented no evidence that he owned the vehicle, that it was registered in his name, or that he was using it with the permission of the registered owner").

Thus, since Harper had the burden of "establish[ing] that he ha[d] a legally cognizable expectation of privacy in the" automobile – and since Harper did not satisfy this burden – we conclude that the trial court erred when it held that Officer Ellis violated Harper's constitutional rights by

conducting the warrantless search of the blue Mercury Marquis automobile.[9]

***Viall***, 890 A.2d at 421-422.

Nevertheless, the above conclusion is not dispositive of this appeal.[10] Certainly, even though Harper did not demonstrate that he possessed a reasonable expectation of privacy in the vehicle, Harper also sought to suppress the evidence because Officer Ellis did not have reasonable suspicion to seize his person. N.T. Suppression Hearing, 9/26/14, at 4-8; ***see also Brendlin v. California***, 551 U.S. 249, 259 (2007), *quoting* 6 W. LaFave, SEARCH AND SEIZURE § 11.3(e) at 194, 195, and n.227 (4th ed. 2004 and Supp 2007) (noting that, even though a passenger does not have an expectation of privacy in another person's vehicle, "[i]f either the stopping of

---

[9] Within the trial court's opinion, the trial court declared that, since it "[did] not find the testimony presented by Officer Ellis credible describing his actions and statements in the hospital parking lot[,] . . . [t]he Commonwealth fell far short of showing [Harper] had no reasonable expectation of privacy and it failed to meet its burden that the ***Terry*** search of the vehicle was legal." Trial Court Opinion, 3/23/15, at 7. The trial court's statement is incorrect, given that both Harper and the Commonwealth introduced the search warrant into evidence and the search warrant declared that the registered owner of the blue Mercury Marquis automobile was an individual named Malcolm Guillaume Garland. Application for Search Warrant and Affidavit, 1/2/14, at 1. Therefore, and regardless of Officer Ellis' testimony, the documentary evidence in this case demonstrated that Harper was not the registered owner of the vehicle.

[10] The Commonwealth claims that "[b]ecause [Harper] lacked a reasonable expectation of privacy in the Mercury, the suppression order should be reversed and there is no need to consider additional issues." Commonwealth's Brief at 14. The Commonwealth's contention is incorrect. ***Brendlin v. California***, 551 U.S. 249, 259 (2007).

the car, the length of the passenger's detention thereafter, or the passenger's removal from it are unreasonable in a Fourth Amendment sense, then surely the passenger has standing to object to those constitutional violations and to have suppressed any evidence found in the car which is their fruit"). Further, when the trial court granted Harper's suppression motion, it did so both because, in its view, Harper possessed an expectation of privacy in the vehicle and the Commonwealth did not establish that Officer Ellis had reasonable suspicion to subject Harper to an investigatory detention. Trial Court Opinion, 3/23/15, at 7-10.

The Commonwealth now argues that the trial court erred when it determined that Officer Ellis lacked reasonable suspicion to seize Harper's person. We agree.

As we explained, "[t]he Fourth Amendment to the [United States] Constitution and Article I, Section 8 of [the Pennsylvania] Constitution protect citizens from unreasonable searches and seizures. To safeguard this right, courts require police to articulate the basis for their interaction with citizens in [three] increasingly intrusive situations." *Commonwealth v. McAdoo*, 46 A.3d 781, 784 (Pa. Super. 2012). Our Supreme Court categorizes these three situations as follows:

> The first category, a mere encounter or request for information, does not need to be supported by any level of suspicion, and does not carry any official compulsion to stop or respond. The second category, an investigative detention, derives from *Terry v. Ohio* and its progeny: such a detention is lawful if supported by reasonable

suspicion because, although it subjects a suspect to a stop and a period of detention, it does not involve such coercive conditions as to constitute the functional equivalent of an arrest. The final category, the arrest or custodial detention, must be supported by probable cause.

*Commonwealth v. Smith*, 836 A.2d 5, 10 (Pa. 2003).

With respect to an investigative detention, our Supreme Court has held: "[to determine] whether an investigative 'stop' occurred, [a court must] view[] all circumstances evidencing a show of authority or exercise of force, including the demeanor of the police officer, the manner of expression used by the  officer in addressing the citizen, and the content of the interrogatories or statements. . . . [T]he pivotal inquiry is whether, considering all the facts and circumstances evidencing the exercise of force, a reasonable man would have thought he was being restrained." *Commonwealth v. Mendenhall*, 715 A.2d 1117, 1119-1120 (Pa. 1998) (internal citations omitted).

"To have reasonable suspicion, police officers need not personally observe the illegal or suspicious conduct, but may rely upon the information of third parties, including 'tips' from citizens." *Commonwealth v. Lohr*, 715 A.2d 459, 461 (Pa. Super. 1998). With respect to these third-party "tips," we have held:

> Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors – quantity and quality – are considered in the "totality of the circumstances – the whole picture," that must be taken into account when evaluating whether there is reasonable suspicion. Thus, if a tip has a relatively low degree of reliability, more

information will be required to establish the requisite quantum of suspicion than would be required if the tip were reliable.

When the underlying source of the officer's information is an anonymous call, the tip should be treated with particular suspicion. However, a tip from an informer known to the police may carry enough indicia or reliability for the police to conduct an investigatory stop, even though the same tip from an anonymous informant would likely not have done so.

Indeed, identified citizens who report their observations of criminal activity to police are assumed to be trustworthy, in the absence of special circumstances, since a known informant places himself at risk of prosecution for filing a false claim if the tip is untrue, whereas an unknown informant faces no such risk. When an identified third party provides information to the police, we must examine the specificity and reliability of the information provided. The information supplied by the informant must be specific enough to support reasonable suspicion that criminal activity is occurring. To determine whether the information provided is sufficient, we assess the information under the totality of the circumstances. The informer's reliability, veracity, and basis of knowledge are all relevant factors in this analysis.

*Commonwealth v. Barber*, 889 A.2d 587, 593-594 (Pa. Super. 2005) (internal quotations and citations omitted).

Finally, we note that, since reasonable suspicion depends upon the totality of the circumstances, the facts and circumstances giving rise to (or failing to give rise to) reasonable suspicion will vary depending upon the specific facts of the case. In the case at bar, the facts of this case reveal that a number of different factors are relevant to our reasonable suspicion analysis. These factors include: the source of the original tip (*i.e.* whether

the source of the tip was an anonymous or a known individual);[11] whether

the tip was predictive of the individual's future behavior;[12] the basis of the

tipster's knowledge;[13] the specificity of the tip;[14] the investigating officer's

training and experience;[15] the physical proximity of the individual seized to

the location given by the tipster;[16] the temporal proximity from the time of

---

[11] **See Barber**, 889 A.2d at 593-594 ("[w]hen the underlying source of the officer's information is an anonymous call, the tip should be treated with particular suspicion.  However, a tip from an informer known to the police may carry enough indicia or reliability for the police to conduct an investigatory stop, even though the same tip from an anonymous informant would likely not have done so)."

[12] **Commonwealth v. Zhahir**, 751 A.2d 1153, 1157 (Pa. 2000) ("[w]here . . . the source of the information given to the officers is unknown, the range of details provided and the prediction of future behavior are particularly significant, as is corroboration by independent police work").

[13] **Commonwealth v. Martin**, 705 A.2d 887, 892 (Pa. Super. 1997) ("[i]n analyzing an anonymous tip, we must determine whether under the "totality of the circumstances" the informant's tip established the necessary reasonable suspicion that criminal activity was afoot.  Critical factors to be considered are the informant's veracity, reliability and basis of knowledge") (internal citations omitted).

[14] **See Zhahir**, 751 A.2d at 1157.

[15] **Commonwealth v. Davis**, 102 A.3d 996, 1000 (Pa. Super. 2014) ("[t]he determination of whether an officer had reasonable suspicion that criminality was afoot so as to justify an investigatory detention is an objective one, which must be considered in light of the totality of the circumstances.  In assessing the totality of the circumstances, a court must give weight to the inferences that a police officer may draw through training and experience") (internal quotations and citations omitted).

[16] **Commonwealth v. Walls**, 53 A.3d 889, 894 (Pa. Super. 2012) (holding that the police had reasonable suspicion to believe the defendant was

*(Footnote Continued Next Page)*

the incident to the time of the tipster's report;[17] the temporal proximity from the time of the receipt of the information to the time the officer came upon the individual seized;[18] whether, before the seizure, the officer witnessed the individual act suspiciously or irregularly or whether the officer witnessed the individual act normally;[19] the time and place of the stop;[20] police

_____

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

involved in criminal activity because of a number of factors, including his "proximity to the location described in the flash, and [the defendant's] matching the description of the suspect").

[17] ***Commonwealth v. Wilson***, 662 A.2d 293, 297 (Pa. Super. 1993) ("[i]n those cases reviewed by [the Superior] Court, where investigatory stops have been validated, the police have acted on the information received from a confidential informant or anonymous tipster almost immediately after the receipt of the information leading one justifiably and reasonably to suspect that criminal activity was afoot").

[18] ***Id.***

[19] ***Commonwealth v. Kearney***, 601 A.2d 346, 347-348 (Pa. Super. 1992) (holding that the "reasonable suspicion . . . standard is met if the police officer's reasonable and articulable belief that criminal activity was afoot is linked with his observation of suspicious or irregular behavior on behalf of the particular defendant stopped") (internal citations and quotations omitted).

[20] ***In the Interest of S.D.***, 633 A.2d 172, 174 (Pa. Super. 1993) (holding that "[t]he time and place of the encounter in this case provided an independent basis for the officer to act on the informant's tip," where the "events took place [in] an area of high drug incidence . . . at 5:25 in the morning").

corroboration of the tip;[21] and, police corroboration of any alleged criminal activity.[22]

We will analyze each of the above factors *seriatim*.

In the case at bar, Lieutenant Johnson (a hospital security guard) informed Officer Ellis that, through an anonymous tipster, Lieutenant Johnson learned that "there were three males that just left the [emergency room]," that one of the three males had a gun, and that the three males were in a blue Mercury automobile that was in the parking lot. N.T. Suppression Hearing, 9/26/14, at 36. There is no evidence that the anonymous tipster stayed at the scene after giving the tip to the security guard or that the anonymous tipster was ever identified; further, there is no evidence that Lieutenant Johnson, as a hospital security guard, was anything other than a private individual acting in a private capacity.

Nevertheless, the Commonwealth claims that the anonymous tip in this case was more reliable because the tip was made in person, as opposed

---

[21] **Commonwealth v. Chase**, 575 A.2d 574, 577 (Pa. Super. 1990) (holding that, even though the radio broadcast a "general description" of "a black man in a blue shirt," the police had probable cause to arrest the defendant, in part, because the radio broadcast the individual's location, and the police corroborated the fact that the defendant was in "the precise locality" described in the broadcast).

[22] **Commonwealth v. Brown**, 996 A.2d 473, 477 (Pa. 2010) ("[a]n anonymous tip, corroborated by independent police investigation, may exhibit sufficient indicia of reliability to supply reasonable suspicion for an investigatory stop").

to telephonically. Commonwealth's Brief at 15. In support, the Commonwealth cites to our opinion in **Commonwealth v. Williams**, 980 A.2d 667 (Pa. Super. 2009). There, an officer "had just received a radio call advising of a robbery in progress, observed [the defendant] in the immediate vicinity of the reported robbery attempting to avoid two female officers who were approaching him on foot, and encountered [an anonymous] witness who was pointing at [the defendant] yelling, 'He has got a gun.'" **Id.** at 671. As we held in **Williams**, even though the witness who yelled "He has got a gun" was anonymous, the tip was more reliable than a typical, uncorroborated, anonymous telephone tip. We explained:

> The situation here . . . is distinguishable [from an anonymous telephone call to the police] in that the tip was made in person, giving [the officer] an opportunity to observe the witness' demeanor and assess his credibility in light of his past experience with investigating crimes. Such a tip must be given more weight than a mere anonymous phone call because a person who knowingly gives false information to any law enforcement officer with intent to implicate another may be held criminally liable [under 18 Pa.C.S.A. § 4906].

**Id.** at 671-671 (internal quotations omitted).

The rule articulated in **Williams** does not apply to the case at bar. In this case, even though the anonymous tipster informed Lieutenant Johnson in person, Lieutenant Johnson was not a law enforcement officer and Lieutenant Johnson did not testify at the suppression hearing. Thus, since Lieutenant Johnson was not a law enforcement officer, the anonymous tipster did not risk prosecution under 18 Pa.C.S.A. § 4906 and, since

Lieutenant Johnson did not testify at the suppression hearing, there was no testimony or cross-examination regarding the lieutenant's skill at "observ[ing] the [tipster's] demeanor and assess[ing] his credibility in light of [the lieutenant's] past experience with investigating crimes." **Williams**, 980 A.2d at 671-672. As such, the twin rationales that support the **Williams** rule are not found in the case at bar and we must conclude that the anonymous tip in this case is entitled to no greater weight than a typical, anonymous telephone tip to the police.

Thus, in this case, we must conclude that the source of the tip was a wholly anonymous person. Further, since the anonymous tip did not predict Harper's future actions, we must conclude that, at the time Officer Ellis was informed of the anonymous tip, the tip "carrie[d] a low degree of reliability." **Commonwealth v. Fell**, 901 A.2d 542, 545 (Pa. Super. 2006) ("[b]ecause an anonymous tip typically carries a low degree of reliability, more information is usually required before investigating officers develop the reasonable suspicion needed to support an investigatory stop of a suspect").

Regarding the source of the tipster's knowledge, we note that the uncontradicted evidence in this case establishes that the tipster told Lieutenant Johnson that he personally witnessed "one of the three males," in the hospital, with a gun. **See** N.T. Suppression Hearing, 9/26/14, at 68 ("[Q:] [Officer Ellis, w]e talked a little bit earlier on cross-examination that – do you remember, going back to [your preliminary hearing testimony,] 'In fact, your information from the security guard was that it wasn't him that

- 26 -

observed the gun; it was a patron inside the hospital – correct[?]' . . . . [A:] Yes, and I responded yes"). It is true that, in this case, the tipster was anonymous and Officer Ellis' testimony regarding the tip constituted double hearsay. However, as a general matter, we note that a tipster's asserted "personal observation" typically imbues the tip with greater reliability than an instance where, for example, the tipster admits that he learned of the information through another person. *See*, *e.g.*, *Commonwealth v. Williams*, 444 A.2d 1278, 1280 (Pa. Super. 1982) (distinguishing between an informant's tip that is based upon "personal knowledge" and a tip that is based upon "common rumor or report").

With respect to the specificity of the tip, the tip in this case was moderately specific, given that the tipster informed Lieutenant Johnson that "there were three males that just left the [emergency room]," that one of the three males had a gun, and that the three males were presently in a blue Mercury automobile that was in the parking lot. It is true that this tip does not describe the race, height, body type, or clothing of any of the three individuals, does not predict any future behavior of the three individuals, and does not specify the particular individual who possessed the weapon. Nevertheless, the uncontradicted evidence in this case demonstrates that Officer Ellis was able to look out onto the "smaller" emergency room parking lot and readily discover a blue Mercury Marquis automobile with three individuals inside. N.T. Suppression Hearing, 9/26/14, at 37-39 and 78.

The next factor in our totality of the circumstances analysis is the investigating officer's training and experience. At the time of the incident, Officer Ellis was a ten-year veteran of the Philadelphia Police force, had been specially selected to be a member of the Narcotics Enforcement Team, and, for the prior six years, had served as a member of the special Narcotics Enforcement Team. *Id.* at 32-33. Therefore, the uncontradicted evidence in this case demonstrates that, at the time of the incident, Officer Ellis had extensive police training and experience.

Next, we examine the physical proximity of Harper to the location given by the tipster. Here, the tipster informed Lieutenant Johnson that the "male with a gun" was accompanied by two other males and that the three men were inside of a blue Mercury automobile that was in the hospital parking lot. *Id.* at 36. It is uncontradicted that, when Officer Ellis walked out to the hospital parking lot, Officer Ellis discovered Harper sitting in a blue Mercury automobile with two other men, and that the vehicle was parked in the hospital parking lot. *Id.* at 38-39. Therefore, in this case, Harper was in the precise location that the tipster declared.

As to the temporal proximity from the time of the incident to the time of the tipster's report and from the time of the tipster's report until the time the officer came upon Harper, the uncontradicted evidence demonstrates that the temporal proximity between all of the relevant events in this case was close. Indeed, Officer Ellis testified that, immediately after he entered the emergency room, Lieutenant Johnson told him "that there were three

males that just left the ER," that one of the three males had a gun, and that the three males were presently in a blue Mercury automobile that was in the parking lot. *Id.* at 36. Officer Ellis testified that, after he received this information, he "turned around and went outside and right to the parking lot." *Id.* Officer Ellis testified that he then scanned the lot for a blue Mercury automobile and was able to discern a blue Mercury automobile with three individuals inside. *Id.* at 38-39. Officer Ellis testified that, after locating the vehicle, he walked toward the automobile and, "immediately upon [him] walking over toward that direction that's when [] Harper exited the vehicle." *Id.* at 39. As such, all of the relevant events in this case occurred in close temporal proximity to one another.

Next, we consider the factor of whether, prior to the seizure, the officer witnessed the individual act suspiciously or irregularly. However, to analyze this factor, we must determine when Officer Ellis seized Harper.[23]

As noted above, after Officer Ellis received the tip, the officer went out into the parking lot, scanned the lot, and noticed a blue Mercury automobile with three people inside. *Id.* at 36-39. Officer Ellis testified that, as soon as

---

[23] Within the trial court's opinion to this Court, the trial court held that Harper was seized at the moment of the frisk. Trial Court Opinion, 3/23/15, at 7 ("[Officer] Ellis performed a *Terry* [f]risk and search upon his first contact with [Harper]"). As we will discuss in the body of this memorandum, we conclude that Harper was seized seconds prior to the frisk, when Officer Ellis got close enough to Harper to tell Harper "[o]kay, stop." N.T. Suppression Hearing, 9/26/14, at 41.

he turned to walk in the direction of the Mercury, Harper exited the vehicle, frantically approached the officers, and informed the officers that he, Harper, was the brother of the shooting victim inside the hospital. *Id.* at 38-42. It is uncontradicted that Harper initiated the contact with the officers, that Harper spoke to the officers before he was spoken to, and that, before Officer Ellis said anything, Harper identified himself as the brother of the shooting victim. *Id.* Further, there is no evidence that, when Officer Ellis and Harper were walking towards one other, Officer Ellis had his weapon pointed at Harper, demonstrated any show of authority, or acted in such a manner as to demonstrate to a reasonable person that Harper was being restrained. *Id.*; *see also Mendenhall*, 715 A.2d at 1119-1120. To be sure, the uncontradicted evidence in this case demonstrates that Harper freely approached Officer Ellis.

As Officer Ellis testified, after Harper frantically declared that he was the brother of the shooting victim, Officer Ellis got close enough to Harper to say "[o]kay, stop," and Officer Ellis then performed a *Terry* pat down on Harper's person. N.T. Suppression Hearing, 9/26/14, at 41.

Therefore, the uncontradicted evidence in this case demonstrates that Harper was not seized until **after** he frantically approached Officer Ellis and declared that he was the brother of the shooting victim. As such, with respect to the behavior of Harper prior to the seizure, we note that it is uncontradicted that Harper acted "frantically" – and not normally – prior to the seizure.

With respect to the next factor – the time and place of the stop – we observe that the stop occurred in the afternoon and at a hospital where a homicide victim had been taken.

Finally, we analyze police corroboration of the tip and police corroboration of any alleged criminal activity. As has already been discussed, on the day in question, Officer Ellis traveled to the Albert Einstein Hospital emergency room because a gunshot victim had been taken to hospital for treatment. As Officer Ellis testified, immediately upon entering the emergency room, Lieutenant Johnson informed Officer Ellis that "there were three males that just left the [emergency room]," that one of the three males had a gun, and that the three males were in a blue Mercury automobile that was in the parking lot. N.T. Suppression Hearing, 9/26/14, at 36. It is uncontradicted that, almost immediately after being informed of the tip, Officer Ellis partially corroborated the tip by identifying three men, inside of a blue Mercury automobile, which was parked in the hospital parking lot.

Further, as both this Court and the trial court held, before the police initiated contact with Harper, Harper exited the vehicle and "frantically" identified himself as the brother of the shooting victim. Given that the anonymous tipster identified one of the "three males that just left the [emergency room]" as possessing a **gun** – and that Harper frantically identified himself as the brother of a **gunshot** victim who was being treated in the emergency room – we conclude that Harper's own statement and

actions further partially corroborated the tip. Stated another way, by declaring (truthfully or not) that he was the brother of the gunshot victim who was being treated in the emergency room, Harper's own statement linked him to the report of a "man with a gun" who had "just left the [emergency room]."

Viewing the totality of "the evidence introduced by [the defendant] along with any evidence introduced by the Commonwealth which remains uncontradicted," we conclude that Officer Ellis had reasonable suspicion to believe that Harper "had something to do" with the shooting incident involving his brother and that he was armed. *See* N.T. Suppression Hearing, 9/26/14, at 58 and 63. Certainly, even though the tip was anonymous and even though the tip initially "carrie[d] a low degree of reliability," the totality of the circumstances in this case establish that Officer Ellis had reasonable suspicion to not only perform a *Terry* frisk of Harper, but to then detain Harper following the *Terry* frisk, so that Officer Ellis could verify Harper's identity. To reiterate, these circumstances include: the asserted, personal basis of the tipster's knowledge; the moderate specificity of the tip, details of which were ultimately corroborated by Officer Ellis; Officer Ellis' extensive police training and experience; the fact that Harper was located in the precise location and accompanied by the same number of people that the tipster declared; the close temporal proximity of all relevant events in this case; Harper's "frantic" and irregular behavior prior to the seizure; the fact that the stop occurred in the parking lot of a hospital

emergency room, where a shooting victim was being treated; the fact that, prior to the seizure, Harper linked himself to the gunshot victim by "frantically" telling Officer Ellis that he was the brother of the gunshot victim; and, the fact that the entire tip revolved around a "man with a gun" – who, it was reported, had been in a hospital emergency room where a gunshot victim was being treated.

Given the totality of the circumstances in this case, we conclude that Officer Ellis had reasonable suspicion to perform a *Terry* frisk of Harper and to then detain Harper following the *Terry* frisk, so that the officer could verify Harper's identity. We conclude that the trial court erred in concluding otherwise.

Further, since Harper did not have an expectation of privacy in the vehicle, we conclude that the trial court erred when it granted Harper's motion to suppress the physical evidence in this case.

Order vacated. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 5/4/2016

- 33 -