J-S23038-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| DUANE MARCEL HOLMES, | : | |
| | : | |
| Appellant | : | No. 2485 EDA 2015 |

Appeal from the Judgment of Sentence July 27, 2015
in the Court of Common Pleas of Lehigh County,
Criminal Division, No(s): CP-39-CR-0003636-2014

BEFORE:  OLSON, SOLANO and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.:                    **FILED JUNE 12, 2017**

Duane Marcel Holmes ("Holmes"), *pro se*,[1] appeals from the judgment of sentence imposed following his conviction of receiving stolen property. *See* 18 Pa.C.S.A. § 3925.  We affirm.

On August 13, 2014, at approximately 6:33 a.m., the Upper Saucon Township Police Department was notified that the burglar alarm for the Verizon Wireless Store at the Promenade Shops had been activated.  The responding patrol officers determined that the front door had been smashed, and several thousand dollars' worth of high-end electronics had been stolen, including cell phones and hotspot devices.

---

[1] Holmes filed a *pro se* Motion for Withdrawal of Counsel on August 5, 2015. The trial court conducted a ***Grazier*** hearing on September 16, 2015, and subsequently granted Holmes's Motion for Withdrawal of Counsel. ***See Commonwealth v. Grazier***, 713 A.2d 81 (Pa. 1998); ***see also*** Pa.R.Crim.P. 121.

At approximately 7:00 a.m., Whitehall Police Detective Jeffrey Bruchak ("Detective Bruchak") and Bethlehem Police Detective Chad Wasserman ("Detective Wasserman"), members of the Lehigh County Auto Theft Task Force, heard a transmission on the Bethlehem Police radio regarding a burglary at a Radio Shack located on Stefko Boulevard in Bethlehem, Pennsylvania. At approximately 7:15 a.m., Detectives Bruchak and Wasserman, in an unmarked police vehicle and in plain clothes, proceeded to the area of 602 North Randolph Street in Allentown, Pennsylvania ("the residence"). Detective Wasserman had previously received information from Detective Edward Kazmierczak ("Detective Kazmierczak"), of the Teaneck, New Jersey Police Department, regarding an investigation of similar crimes in New Jersey, and identifying Holmes as a person involved in those crimes. Detective Kazmierczak also told Detective Wasserman that Holmes would likely be staying at 602 North Randolph Street. When Detectives Bruchak and Wasserman arrived, they observed a green minivan with New Jersey license plates parked on the street, on the south side of the house, and a black Lexus[2] pulling up around minivan. Both vehicles drove away.

Detectives Bruchak and Wasserman relocated their vehicle, stopping about one block east of the residence, to set up surveillance. At that time, Detective Wasserman was in communication with Bethlehem Police

---

[2] Detective Wasserman had previously driven past the residence and had observed the black Lexus, registered to Holmes, parked in front of the residence.

Detective Jason Fulmer and Detective Sergeant Michelle Kott ("Detective Sergeant Kott") (collectively, "the Bethlehem detectives"), who were reviewing video surveillance from the Radio Shack burglary.[3]   The Bethlehem detectives informed Detective Wasserman that the video surveillance showed a male throwing what appeared to be a hammer through the door to smash the window.  The Bethlehem detectives told Detective Wasserman that two males entered the store, carrying a crowbar, a blue tote, and yellow bolt cutters.  Additionally, the Bethlehem detectives told Detective Wasserman that one of the males was wearing a black shirt and camouflage pants; the other was wearing a camouflage jacket; and both of their faces were covered.  The Bethlehem detectives also told Detective Wasserman that they could see a green minivan near the store.

The black Lexus was parked in front of the residence by the time Detectives Bruchack and Wasserman relocated their vehicle.  Using binoculars, Detective Bruchak observed two black males, who were wearing light-colored t-shirts, in the backyard of the residence carrying a large blue tote.  Detective Bruchak opined that the tote was heavy because the two males appeared to be struggling to carry it.  The males entered the residence carrying the blue tote.  Several minutes later, Detective Bruchak observed another black male, wearing a camouflage jacket, walk west on

---

[3] Detective Wasserman also communicated Detective Bruchak's observations to Allentown Police Detective Raymond Ferraro ("Detective Ferraro"), as well as the Allentown and Bethlehem Police Departments.

East Allen Street and enter the residence. After several minutes passed, Detective Bruchak observed a black male exit the front door, carrying a dark-colored duffle bag with orange trim, place the duffle bag in the trunk of the Lexus, and return to the house. Detective Bruchak then observed a black male exit the house, place a plastic garbage bag behind the front passenger seat of the Lexus, and return to the house.

Several minutes later, Detective Bruchak observed one of the males exit the front door of the residence, and walk east on East Allen Street. A second male subsequently left the house and walked in the same direction. Detective Bruchak observed the green minivan pull up and park on the side of the residence. According to Detective Bruchak, a black male exited the minivan from the front passenger door, walked to the back of the house, retrieved an item that was "long and rectangular in shape" and covered by a white towel or blanket, and placed the item in the van. The minivan pulled away from the house and proceeded west on East Allen Street. Detective Bruchak then observed a black male exit from the front door of the residence, get into the black Lexus, and travel west on East Allen Street. Detective Wasserman informed officers in the Allentown Police Department that the vehicles had left the residence. Detectives Bruchak and Wasserman remained at their surveillance location for several more minutes to make sure no one else came to or left the house.

At approximately 8:34 a.m., an Allentown Police Officer stopped the black Lexus, which Holmes was driving, at the direction of Detective Ferraro.[4] When Detective Ferraro arrived at the location of the traffic stop, Holmes was in the back seat of a police car. By looking into the window of the Lexus, Detective Ferraro observed, in plain view, a camouflage jacket on the back seat, on top of a garbage bag. A subsequent warrantless search of the Lexus revealed gloves, head socks, a ninja-style mask, and a camouflage bag with orange trim containing approximately 80 cell phones in their original packaging. The Upper Saucon detectives, who responded to the Verizon Wireless Store burglary, confirmed that the recovered cell phones had been stolen from the Verizon Wireless Store.

Holmes filed an Omnibus Pretrial Motion, including, *inter alia*, Motions to suppress physical evidence recovered from his vehicle and residence.

_____

[4] At approximately 8:42 a.m., the minivan stopped at the Congress Apartments, and the occupants fled on foot. At that time, Detectives Bruchak and Wasserman left their surveillance location, and drove to the Congress Apartments. When Detective Bruchak looked into the minivan's passenger side window, he noticed that the ignition had been punched out of the steering column. The green minivan was registered to the New Jersey Department of the Treasury, but had not been reported stolen at that time. However, after being informed that officers found the minivan and the ignition had been removed, the New Jersey Department of the Treasury confirmed that the minivan had, in fact, been stolen from their lot, and gave the detectives permission to conduct a search. A search of the minivan revealed a white towel, broken glass, a yellow crowbar, a mallet, and orange bolt cutters. Detectives Bruchak and Wasserman stayed in that location until a tow truck arrived. Thereafter, Detectives Bruchak and Wasserman briefly met Detective Ferraro at the residence, and proceeded to the vehicle stop.

Following a suppression hearing, the trial court denied Holmes's Motion to suppress physical evidence recovered from his vehicle, and, by agreement of counsel,[5] the trial court granted his Motion to suppress physical evidence from his residence.

On April 28, 2015, following a jury trial, Holmes was convicted of receiving stolen property, graded as a felony of the third degree. On July 27, 2015, the trial court sentenced Holmes a term of 2½ to 5 years in prison. Holmes, through counsel, filed a timely Notice of Appeal. Holmes filed a counseled, court-ordered Pa.R.A.P. 1925(b) Concise Statement of errors complained of on appeal. Holmes thereafter filed a *pro se* Concise Statement.

On appeal, Holmes raises the following questions for our review:

1. Did the trial court err as a matter of law in denying Holmes'[s M]otion to suppress evidence seized from the search of his automobile[,] in violation of his state and federal constitutional rights to be free from unreasonable searches and seizures?

2. Were [Holmes's] rights under the Fourth Amendment to the United States Constitution[,] and Article [1], Section[s 8] and [9] of the Pennsylvania Constitution[,] violated when suppressed, illegally[-]obtained evidence was affirmatively used throughout Holmes'[s] jury trial to convict Holmes of [a] crime?

Brief for Appellant at 2.

---

[5] During the suppression hearing, the Commonwealth conceded that the search warrant for Holmes's residence was not supported by probable cause. *See* N.T., 3/25/15, at 7.

In his first claim, Holmes argues that the trial court erred in denying his Motion to suppress physical evidence seized from the search of his vehicle (the black Lexus). *Id.* at 12. Holmes asserts that he was subjected to an investigative detention without the requisite reasonable suspicion. *Id.* at 13-15.[6] Holmes claims that "there was no identification of Holmes as having played a role in any activities described by law enforcement." *Id.* at 22.

> In reviewing the denial of a motion to suppress, our responsibility is to determine whether the record supports the suppression court's factual findings and legitimacy of the inferences and legal conclusions drawn from those findings. If the suppression court held for the prosecution, we consider only the evidence of the prosecution's witnesses and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted. When the factual findings of the suppression court are supported by the evidence, the appellate court may reverse if there is an error in the legal conclusions drawn from those factual findings.

*Commonwealth v. Arnold*, 932 A.2d 143, 145 (Pa. Super. 2007) (citation omitted).

---

[6] As part of a lengthy discussion regarding the search of the residence, Holmes also argues that he was subjected to a custodial detention, without the requisite probable cause, because he was held in the back of a police car during the residence search. *See* Brief for Appellant at 17, 20, 21. However, the residence search is not at issue in the instant appeal, as all evidence arising therefrom was suppressed during the suppression hearing. Moreover, to the extent that Holmes challenges his detention during the vehicle search, we note that detention in a police car, without more, does not necessarily escalate an investigative detention into a custodial detention. *See Commonwealth v. Revere*, 814 A.2d 197, 200-01 (Pa. Super. 2002) (concluding that appellant was not subjected to a custodial detention, where he was detained in a police car for a brief period of time, the officers did not use force or restraints, and the transportation of appellant was supported by exigent circumstances).

There are three categories of interactions between police and a citizen, pursuant to Article I, Section 8 of the Pennsylvania Constitution:

> The first is a "mere encounter," which need not be supported by any level of suspicion. The second is an "investigative detention," which must be supported by reasonable suspicion. This interaction subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. The third category, a "custodial detention," must be supported by probable cause. The police have probable cause where the facts and circumstances within the officer's knowledge are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed.

*Commonwealth v. Randolph*, 151 A.3d 170, 177 (Pa. Super. 2016) (citations and some quotation marks omitted).

Here, the trial court concluded that Holmes was subjected to an investigative detention when police stopped his vehicle. When evaluating the legality of investigative detentions, Pennsylvania has adopted the holding of *Terry v. Ohio*, 392 U.S. 1 (1968), wherein the United States Supreme Court held that police may conduct an investigative detention if they have reasonable suspicion that criminal activity is afoot.

> Our Supreme Court has mandated that law enforcement officers, prior to subjecting a citizen to an investigatory detention, must harbor at least a reasonable suspicion that the person seized is then engaged in unlawful activity. The question of whether reasonable suspicion existed at the time of an investigatory detention must be answered by examining the totality of the circumstances to determine whether the officer who initiated the stop had a particularized and objective basis for suspecting the individual stopped. Thus, to establish grounds for reasonable suspicion, the officer must articulate specific observations which, in conjunction with reasonable inferences derived from those observations, led him reasonably to conclude, in light of his

experience, that criminal activity was afoot and that the person he stopped was involved in that activity.

***Commonwealth v. Reppert***, 814 A.2d 1196, 1203-04 (Pa. Super. 2002) (*en banc*) (internal citations omitted).  Additionally,

[f]or a stop to be valid, someone in the police department must possess sufficient information to give rise to reasonable suspicion.  The officer with the reasonable suspicion, usually the dispatcher, need not convey all of this background information to the officer who actually effectuates the stop.  Thus, the police may justify the search by presenting sufficient evidence at the suppression hearing that someone in the chain of command had reasonable suspicion before the stop, even if the arresting officer did not.

***Commonwealth v. Wiley***, 858 A.2d 1191, 1197 n.4 (Pa. Super. 2004) (citations omitted).

The trial court considered Holmes's claim, and concluded that the vehicle stop was supported by reasonable suspicion, based on Detective Wasserman's knowledge regarding an ongoing investigation of Holmes's involvement in similar crimes, the description of the Radio Shack robbery provided by the Bethlehem detectives, and Detective Bruchak's observations at the residence.  ***See*** Trial Court Opinion, 4/24/15, at 21-24.  The trial court also concluded that the warrantless search of Holmes's black Lexus was supported by probable cause based on Detective Bruchak's observations at the residence (which had been communicated to Detective Ferraro by Detective Wasserman), Detective Ferraro's knowledge that a crowbar and a mallet had been recovered from the minivan, and Detective Ferraro's own observations of a garbage bag and camouflage jacket, in plain view, in the

back seat of the Lexus after the stop. *See id.* at 24-27. The trial court's findings are supported in the record.

At the suppression hearing, Upper Saucon Township Detective Dane Carroll ("Detective Carroll") testified that on August 13, 2014, at approximately 6:30 a.m., the Upper Saucon Township Police Department was alerted to the activation of the burglar alarm at the Verizon Wireless Store at the Promenade Shops. *See* N.T., 3/20/15, at 45-46.

Detective Wasserman testified that at approximately 7:00 a.m., he heard a transmission on his Bethlehem Police radio regarding a burglary that occurred at the Radio Shack on Stefko Boulevard. *See* N.T., 3/17/15, at 15-16. Detective Wasserman testified that upon hearing the transmission, he and Detective Bruchak proceeded to 602 North Randolph Street, based on his work on an ongoing investigation with other agencies. *See id.* at 17-18. Specifically, according to Detective Wasserman, Detective Kazmierczak told him about recent "smash-and-grab" burglaries of cell phone stores in New Jersey, identified Holmes as someone involved in those burglaries, and told him that he believed Holmes would be staying at 602 North Randolph Street. *See id.* at 17-18, 20-21, 22, 23-24. Detective Wasserman testified that he had previously driven past the residence, and had seen a black Lexus registered to Holmes, parked outside. *See id.* at 24-25.

Detective Bruchak testified that he and Detective Wasserman arrived at the residence, in an unmarked vehicle and in plain clothes, about 10 to 15

minutes after hearing the radio transmission. *See* N.T., 3/20/15, at 7. According to Detective Bruchak, a green minivan was parked on the street, on the south side of the house, and a black Lexus pulled around it. *See id.* at 8-9. Detective Bruchak testified that both vehicles passed their unmarked car, and he and Detective Wasserman subsequently relocated their vehicle to conduct surveillance. *See id.* at 9-10.

At that time, Detective Wasserman was in communication with the Bethlehem detectives, who were reviewing video surveillance of the Radio Shack burglary, as well as Detective Ferraro and the Allentown and Bethlehem Police Departments. *See* N.T., 3/17/15, at 28-29. According to Detective Wasserman, the Bethlehem detectives informed him that two males entered the store by throwing what appeared to be a hammer through the window, and that the men were carrying a large blue tote, bolt cutters, and a yellow crowbar. *See id.* at 31-32. The Bethlehem detectives also told Detective Wasserman that they could see a green minivan outside the store. *See id.* at 32, 33. Detective Wasserman also learned that one of the males was wearing a black shirt and camouflage pants; the other was wearing a camouflage jacket; and both had their faces covered. *See id.* at 33.

Detective Bruchak testified that, using binoculars, he saw the black Lexus parked in front of the residence. *See* N.T., 3/20/15, at 12. Further, he observed two black males in the backyard of the residence, carrying a large blue tote toward the house. *See id.* Detective Bruchak noted that "it

looked like [] they were struggling to carry it…." *Id.* Detective Bruchak then observed a black male walk west on East Allen Street and enter the residence through the front door. *See id.* at 14. Detective Bruchak testified that, several minutes later, a black male exited the residence, placed a dark-colored duffle bag with orange trim in the trunk of the Lexus, and returned to the residence. *See id.* Detective Bruchak also testified that, several minutes later, the same male exited the residence, placed a plastic garbage bag (which "appeared to have items in it") in the back seat of the Lexus, and returned to the residence. *Id.* at 15.

Detective Bruchak testified that, about 10 to 15 minutes later, a black male exited the residence and walked east on East Allen Street. *See id.* at 16. Several minutes later, Detective Bruchak observed another black male exit the residence and walk east on East Allen Street. *See id.* at 19. Detective Bruchak testified that the green minivan, coming from the direction in which the two males had just walked, returned to the residence and parked on the south side of the residence. *See id.* at 19-20. Detective Bruchak observed the front passenger exit the minivan and place a white towel or blanket on top of something in the backyard, and then place the item, which was rectangular in shape, in the back of the minivan. *See id.* at 23. Detective Bruchak testified that the minivan then drove west on East Allen Street. *See id.* at 24. Additionally, Detective Bruchak testified that a

black male exited the residence through the front door, got into the Lexus, and drove west on East Allen Street. *See id.*

Detective Wasserman informed the Allentown Police Department that the vehicles had left 602 North Randolph Street and provided their direction of travel. *See* N.T., 3/17/15, at 35. Detectives Wasserman and Bruchak remained at the residence for several minutes. *See id.* Detective Bruchak testified that they heard over the police radio that the minivan had parked at the Congress Apartments, and two males were seen fleeing on foot. *See* N.T., 3/20/15, at 26. Detectives Bruchak and Wasserman proceeded to the Congress Apartments. *See id.* at 26. Detective Bruchak testified that by looking through the passenger window of the minivan, he could see that the ignition had been punched out. *See id.* at 28. Detective Bruchak stated that the minivan was registered to the New Jersey Department of the Treasury, but had not been reported stolen at that time. *See id.* Additionally, Detective Bruchak testified that the New Jersey Department of the Treasury subsequently confirmed that the minivan had been stolen from their lot and gave the detectives permission to conduct a search. *See id.* Detective Bruchak observed broken glass on the floor of the minivan, and found a white towel, a yellow crowbar and orange bolt cutters. *See id.*

Detective Ferraro testified that on August 13, 2014, at approximately 7:00 a.m., he received a call from Detective Wasserman, who advised him of the Radio Shack burglary, and told Detective Ferraro that he was going to

602 North Randolph Street to conduct surveillance. **See** N.T., 3/25/15, at 17-18. Detective Ferraro added that he had spoken to Detective Kazmierczak in February 2014, who told Detective Ferraro about an ongoing investigation of Holmes in connection with smash-and-grab burglaries in New Jersey. **See id.** at 19; **see also id.** (wherein Detective Ferraro testified that Detective Kazmierczak had also told him that Holmes would probably be staying at 602 North Randolph Street). Detective Ferraro testified that, throughout the morning, he was communicating via cell phone and police radio with Detective Wasserman and other detectives. **See id.** at 21. Additionally, Detective Ferraro testified that, after being made aware that the minivan's ignition had been punched out, he made contact with the New Jersey Department of the Treasury, which ultimately verified that the minivan had been stolen from their lot. **See id.** at 23-24. Detective Ferraro stated that he was aware that a crowbar and a mallet had been recovered from the van. **See id.** at 24-25. According to Detective Ferraro, Holmes was in the back of an Allentown police car when he arrived at the vehicle stop of the Lexus. **See id.** at 26-27. Detective Ferraro testified that, by looking into the window of the Lexus, he immediately observed a camouflage jacket in the passenger side of the back seat, sitting on top of a garbage bag. **See id.** at 26; **see also id.** (wherein Detective Ferraro testified that he had information that one of the males involved in the Radio Shack burglary was wearing a camouflage jacket). Detective Ferraro also testified that

during the course of the vehicle search, the detectives found a large duffle bag in the trunk, which contained approximately 80 cell phones in their original packaging. *See id.* at 27-28. Further, Detective Ferraro confirmed that the phones had been stolen during the Verizon Wireless Store burglary. *See id.* at 29; *see also* N.T., 3/20/15, at 47 (wherein Detective Carroll testified that he matched the serial numbers on the recovered cell phones to the inventory list provided by the manager of the Verizon Wireless Store).

Upon review, we conclude that the evidence of record supports the trial court's factual findings. *See Arnold*, 932 A.2d at 145. Detectives Wasserman and Ferraro had both received information from Detective Kazmierczak regarding an ongoing investigation of Holmes in connection with a series of smash-and-grab burglaries in New Jersey. Detective Wasserman and Detective Ferraro were also aware that Holmes would likely be staying at 602 North Randolph Street, and previous drive-bys confirmed that the black Lexus was registered to Holmes. Based on the Bethlehem detectives' review of the Radio Shack surveillance footage, Detective Wasserman and Detective Bruchak were aware that one of the males involved in the burglary was wearing a camouflage jacket; the suspects used a blue tote; and a green minivan was parked outside of the store. Detectives Wasserman and Bruchak arrived at the residence within 10 to 15 minutes of receiving the radio transmission. Additionally, while conducting surveillance of the residence, Detective Bruchak observed two black males

carry a large blue tote into the house from the backyard, before another black male, wearing a camouflage jacket, entered the front door of the residence. Officer Bruchak then observed a black male carry a dark-colored duffle bag and a garbage bag to the Lexus. Further, Officer Bruchak observed two males place a covered object into the back of the minivan before leaving. Finally, a black male exited the front of the residence, and drove away in the black Lexus. Thus, based on the totality of the circumstances, we discern no abuse of discretion in the trial court's determination that Detective Ferraro had reasonable suspicion that criminal activity was afoot at the time he ordered the stop of the Lexus. *See Commonwealth v. Roman*, 714 A.2d 440, 443 (Pa. Super. 1998) (concluding that investigatory detention was supported by reasonable suspicion, where, within minutes of receiving a tip that two individuals were on a stolen bike, the police officer saw two individuals on a bike in that location, and determined that the bike was stolen based on the serial number); *see also Wiley, supra*.

Moreover, after the initial stop of the Lexus, Detective Ferraro became aware that the minivan had been stolen from the New Jersey Department of the Treasury, and that a search of the minivan revealed a mallet, bolt cutters, and a crowbar. Consistent with Detective Bruchak's observations at the residence, Detective Ferraro observed, in plain sight through the window of the Lexus, a garbage bag and camouflage jacket. Therefore, we discern

no abuse of discretion in the trial court's conclusion that the warrantless search of the Lexus was supported by probable cause. ***See Commonwealth v. Gary***, 91 A.3d 102, 138 (Pa. 2014) (holding that "[t]he prerequisite for a warrantless search of a motor vehicle is probable cause to search; no exigency beyond the inherent mobility of a motor vehicle is required."). Accordingly, Holmes is not entitled to relief on his first claim.[7]

In his second claim, Holmes contends that the trial court erred in allowing the admission of illegally-obtained evidence during trial. Brief for Appellant at 26. Holmes argues that the trial court improperly referenced the blue tote found in his residence multiple times during his trial. ***Id.*** at 28-29. Holmes claims that the Commonwealth also improperly admitted as evidence video surveillance footage of the suspects carrying a blue tote, a photograph of the blue tote positioned behind reportedly stolen merchandise, and various items documented during the search of his residence (*i.e.*, a mallet, black head socks, and a ninja-style mask). ***Id.*** at 29.

---

[7] Holmes argues that the evidence recovered from the vehicle search should be suppressed as "fruit of the poisonous tree," resulting from the illegal search of his residence. Brief for Appellant at 18, 26. However, we observe the vehicle search occurred several hours before the search of Holmes's residence. Thus, the evidence recovered from the vehicle search did not arise out of the illegal search of Holmes's residence. ***See Commonwealth v. Johnson***, 68 A.3d 930, 946 (Pa. Super. 2013) (stating that "[a] fruit of the poisonous tree argument requires an **antecedent** illegality.") (emphasis added, citation omitted).

Our standard of review concerning the admissibility of evidence is well settled:

> With regard to the admission of evidence, we give the trial court broad discretion, and we will only reverse a trial court's decision to admit or deny evidence on a showing that the trial court clearly abused its discretion. An abuse of discretion is not merely an error in judgment, but an overriding misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of the record.

*Commonwealth v. Talbert*, 129 A.3d 536, 539 (Pa. Super. 2015) (citation omitted).

Initially, our review of the record reveals that Holmes failed to object to any of the references made to the blue tote at trial. Additionally, Holmes's trial counsel specifically stated that he had no objection to the admission of the other challenged evidence (*i.e.*, surveillance footage, a photograph of the blue tote, a mallet, and various masks). Accordingly, Holmes's second claim is waived. *See Commonwealth v. Molina*, 33 A.3d 51, 55 (Pa. Super. 2011) (stating that "a defendant's failure to object to allegedly improper testimony at the appropriate stage in the questioning of the witness constitutes waiver." (citation and quotation marks omitted)); *see also Commonwealth v. Pearson*, 685 A.2d 551, 555 (Pa. Super. 1996) (*en banc*) (stating that "[f]ailure to raise a contemporaneous objection to the evidence at trial waives that claim on appeal." (citing Pa.R.A.P. 302(a)).

We additionally note that, the challenged references to the blue tote were made by Detective Bruchak, based on his personal observations while conducting surveillance, prior to the search of Holmes's residence. **See Commonwealth v. Povish**, 387 A.2d 1282, 1284-85 (Pa. 1978) (concluding that, although certain items of clothing had been suppressed, the trial court did not err in allowing the introduction of a copy of the police report containing descriptions of that clothing, as reported by witnesses, because "[t]here was ample evidence that the description of the clothing worn by the perpetrator of the robberies had been ascertained from independent sources prior to the illegal search."). Moreover, contrary to Holmes's assertion, the complained-of items were not found during the search of his residence. **See** N.T., 4/27/15, at 106 (wherein Detective Sergeant Kott testified that she collected the hammer mallet from the minivan); **see also** N.T., 4/28/15, at 38 (wherein Detective Ferraro testified that the ninja-style mask and head socks were recovered from the Lexus). Accordingly, the trial court did not err in admitting the challenged evidence, and Holmes is not entitled to relief on his second claim.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/12/2017